# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| JIMMIE C GARDNER<br>2006 Colquitt Avenue<br>Albany, GA 31707<br><br>*Plaintiff*,<br><br>*v.*<br><br>KANAWHA COUNTY, WEST VIRGINIA,<br>C/o Vera McCormick, Kanawha County Clerk<br>400 Virginia Street East<br>Charleston, WV 25301,<br><br>KANAWHA COUNTY COMMISSION,<br>C/o Kent Carper, President<br>400 Virginia Street East<br>Charleston, WV  25301,<br><br>KANAWHA COUNTY PROSECUTING,<br>ATTORNEY, in his official capacity,<br>C/o Chuck Miller, Prosecuting Attorney<br>301 Virginia Street East<br>Charleston, WV 25301,<br><br>WILLIAM C. FORBES,<br>1506 Chafton Road<br>Charleston, WV 25314,<br><br>REAGAN E. WHITMYER,<br>412 Fletcher Road, Apt. 2<br>Scott Depot, WV 25560,<br><br>JOHN J. FRAIL,<br>829 Edgewood Drive<br>Charleston, WV 25302,<br><br>*and*<br><br>CHARLESTON POLICE DEPARTMENT<br>C/o Steve Cooper, Chief of Police<br>501 Virginia Street East, 3rd Floor<br>Charleston, WV  25301,<br><br>*Defendants*. | Civil Action No.   2:17-03934 |

## COMPLAINT AND JURY DEMAND

Plaintiff Jimmie C Gardner, by and through undersigned counsel, for his Complaint against Kanawha County (West Virginia); the Kanawha County Commission; the Kanawha County Prosecuting Attorney in his official capacity; William C. Forbes; Reagan E. Whitmyer; John J. Frail; and the Charleston Police Department ("Defendants") alleges as follows:

## NATURE OF THE CASE

1.      This is an action for damages arising from the malicious prosecution and wrongful conviction of Plaintiff Jimmie C Gardner and the more than twenty-six years of wrongful imprisonment resulting from such conviction.   This Complaint presents an extraordinary and egregious example of misconduct and harm at the hands of the Defendants who—through their conduct, policies, patterns and practices—were responsible for the false presentation of evidence in Mr. Gardner's case and the decades of harm that resulted from this misconduct.

## PARTIES

2.      Plaintiff Jimmie C Gardner is an individual person and a citizen of the State of Georgia.  On March 5, 1990, at only twenty-three years of age, Mr. Gardner was wrongfully convicted and sentenced to up to 110 years of incarceration.  Mr. Gardner proceeded to spend more than twenty-six years of his life behind bars for a crime he did not commit.

3.      Defendant Kanawha County is a West Virginia municipality which employs members of the Kanawha County Prosecuting Attorney's Office and the Kanawha County Commission and is deemed a citizen of the State of West Virginia.  Through its own conduct,

policies, patterns and practices, in addition to the conduct of its officers, attorneys, employees, representatives, and agents, this Defendant is liable to Mr. Gardner for damages.

4.     Defendant Kanawha County Commission, a citizen of the State of West Virginia, is responsible for managing and supervising the affairs of Kanawha County including the operation of government and use of public resources.  Through its own conduct, policies, patterns and practices, in addition to the conduct of its officers, attorneys, employees, representatives, and agents, this Defendant is liable to Mr. Gardner for damages.

5.     Defendant Kanawha County Prosecuting Attorney is the county agent responsible for criminal prosecutions in Kanawha County and is deemed a citizen of the State of West Virginia.  The Kanawha County Prosecuting Attorney, in his official capacity, is liable to Mr. Gardner for his own conduct, policies, patterns and practices as well as that of prior Prosecuting Attorneys, in addition to the conduct of the attorneys, employees, representatives, and agents of the Kanawha County Prosecuting Attorney's Office.  This Defendant's relevant conduct includes administrative, investigative and other functions that are not subject to prosecutorial immunity.

6.     Defendant William C. Forbes is a citizen of the State of West Virginia and a former County Prosecutor for Kanawha County who was responsible for some or all of the events described herein.  This Defendant's relevant conduct includes administrative, investigative and other functions that are not subject to prosecutorial immunity.

7.     Defendant Reagan E. Whitmyer is a citizen of the State of West Virginia and a current or former Assistant County Prosecutor for Kanawha County who was responsible for some or all of the events described herein.  This Defendant's relevant conduct includes administrative, investigative and other functions that are not subject to prosecutorial immunity.

8.      Defendant John J. Frail is a citizen of the State of West Virginia and a current or former Assistant County Prosecutor for Kanawha County who was responsible for some or all of the events described herein.   This Defendant's relevant conduct includes administrative, investigative and other functions that are not subject to prosecutorial immunity.

9.      Defendant Charleston Police Department is a citizen of the State of West Virginia and is one of the entities responsible for the investigation regarding Jimmie Gardner and the events described herein.  Through its own conduct, policies, patterns and practices, in addition to the conduct of its officers, employees, representatives, and agents, this Defendant is liable to Mr. Gardner for damages.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claim under 42 U.S.C. § 1983 arises under the laws of the United States.

11.      This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are citizens of different States and there is more than $75,000 in controversy, as Mr. Gardner is seeking at least $25 million in damages.

12.      This Court has supplemental jurisdiction over the claims in this Complaint that arise under the statutory and common law of the State of West Virginia pursuant to 28 U.S.C. § 1367 because the state law claims are so related to the federal law claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

13.      This Court has personal jurisdiction over Defendants because they reside in and conduct business in this District.

14.     Venue is proper pursuant to 28 U.S.C. § 1391 because this is the judicial district in which the Defendants reside and this is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

## FACTUAL ALLEGATIONS

### Defendants' Pattern And Practice of Approving and Using An Unreliable "Expert" Witness Who Lacked Appropriate Qualifications And Regularly Falsified Evidence

15.     For many years and across dozens of cases, the Kanawha County Prosecuting Attorney's Office used West Virginia State Police serologist Fred Zain as an expert witness on their cases, as a matter of pattern and practice, despite knowing or recklessly disregarding information that Zain was not properly vetted, lacked appropriate qualifications, and was regularly presenting false testimony in criminal cases (the "Zain Evidence").

16.     The Kanawha County Prosecuting Attorney's Office took these actions under the direction of the Kanawha County Prosecuting Attorney and with the involvement and direction of individuals including Defendants Forbes, Whitmyer, and Frail.

17.     The Charleston Police Department also relied on information and results of testing supposed conducted by Zain without properly vetting and supervising him.

18.     Even after Zain left the West Virginia State Police and moved to Texas, the County Prosecuting Attorney's Office continued its association with Zain by approving him as a contractor and vendor and continuing to use him on its cases.  The repeated use of Zain in these cases was no coincidence, but rather part of a pattern and practice of using an unvetted, unqualified and unreliable witness to provide supposed expert testimony.

19.     The West Virginia State Police knew as early as 1985 or earlier that Zain did not have appropriate academic credentials to serve as a serology expert based on correspondence

5

received from the FBI.

20.     Since 1985, the County Prosecuting Attorney's Office also knew or should have known that Zain did not have appropriate credentials to serve as a serology expert in cases prosecuted by that Office.

21.     Between 1985 and 1989, the West Virginia State Police received complaints from other State Troopers that Zain was making improper and unjustified findings in the laboratory. On information and belief, Zain became the subject of a "magic wand" joke—Troopers would say Zain waved a magic wand because that was the only way he could get the results he obtained.

22.     Since the 1985-1989 time period, the County Prosecuting Attorney's Office, including Defendants Forbes, Whitmyer and Frail, also knew or should have known that Zain's findings and testimony were not reliable and that he should not be used as a serology expert in cases prosecuted by that Office.

23.     In July 1989, Zain moved to Texas and continued work in the serology field.

24.     Shortly thereafter, prosecutors began complaining that the results from the State Police laboratory were not as good—i.e., not as incriminating—as when Zain was there.

25.     Separately, State Police laboratory personnel refused to stand by the results of work Zain had done while with the State Police. The Director of the Serology Division, Trooper Ted Smith, instructed lab personnel to not automatically accept Zain's work and only testify as to what they felt was supportable.

26.     Trooper Smith told his superiors at the State Police that he and others who worked in the lab would not testify to Zain's reports and results. On information and belief, Trooper Smith also told at least one member of the County Prosecuting Attorney's Office that the State

6

Police were not standing behind Zain's work.

27.     The County Prosecuting Attorney's Office, including Defendants Forbes, Whitmyer and Frail, ignored these clear warnings and warning signs and continued to rely on Zain Evidence.  At all relevant times, the County Prosecuting Attorney's Office pushed for convictions even when inconsistent with justice.

28.     The County Prosecuting Attorney's Office began pulling evidence from the State Police laboratory and sending it to Zain in Texas for testing.  The County Prosecuting Attorney's Office used Zain as a contractor even though there were qualified examiners in the local West Virginia laboratory, even on cases on which Zain did not do the initial laboratory testing or have any other prior involvement with the case.  On more than one occasion, Zain obtained "better" results—or results more favorable for the prosecution—on examination of the same evidence than did the West Virginia State Police laboratory.

29.     After West Virginia laboratory personnel refused to testify to Zain's results, the County Prosecuting Attorney's Office, including Defendants Forbes, Whitmyer and Frail, flew Zain from Texas to West Virginia to testify in certain cases.

30.     The County Prosecuting Attorney's Office, with the assistance or knowledge of Defendants Forbes, Whitmyer and Frail, enrolled Zain as a contractor and vendor and approved him for payments.  These were administrative matters that occurred apart from the prosecution in any particular case.  By having Zain as an approved contractor, prosecutors were able to repeatedly call upon his services for various cases, including in Mr. Gardner's case.

31.     Zain was used repeatedly as an expert witness under these conditions, with the knowledge, support and approval of the Kanawha County Prosecutor and Assistant County Prosecutors, including Defendants Forbes, Whitmyer and Frail.

32.     The Kanawha County Prosecutor is the policymaker and final decision-maker regarding the use of contracted expert witnesses and the policies and procedures for vetting and approving said experts.

33.     At the time the Kanawha County Prosecutor approved Zain's engagement, the Kanawha County Prosecutor knew or should have known of Zain's history of presenting unreliable and fraudulent testimony.  The Kanawha County Prosecutor certainly knew of and endorsed his office's pattern and practice of bringing Zain back for his "better" results, even though the State Police had the required expertise available locally and less expensively.  The engagement of Zain presented a known and unreasonable risk of constitutional violations to the defendants at issue.

34.     The County Prosecuting Attorney's Office's pattern and practice of enrolling an unqualified and unreliable expert as a vendor, retaining that expert in particular cases, and allowing that expert to present falsified testimony caused the violation of clearly established laws of which a reasonable official would have known.

35.     The County Prosecuting Attorney's Office, including Defendant Forbes, Whitmyer and Frail, were also responsible for Mr. Gardner's continued incarceration after Zain's wrongdoing began to come to light.  In particular, on information and belief, Defendant Forbes received a letter from the State Police Superintendent in November 1992 indicating that there were no further problems with Zain Evidence or related defendants, but Defendant Forbes did not believe that conclusion and even reported his disbelief to third parties.  Nonetheless, Defendant Forbes viewed this letter as a shield that protected him from future scrutiny and thus Defendant Forbes declined to further follow-up on information indicating his office has been presenting false Zain evidence in many criminal cases including Mr. Gardner's case.  Defendant

Forbes instructed his assistant prosecutors to put a copy of the letter into every criminal file Zain had touched. These actions constituted administrative actions separate and apart from the prosecution of particular defendants in particular cases.

36.     At all relevant times, Kanawha County employees and County-sponsored witnesses were not reasonably or adequately hired, retained, trained and/or supervised, including with respect to the proper procedures for storing, handling and analyzing evidence; interpreting and testifying on the basis of that evidence; and the reporting of discrepancies and noncompliance events up the chain of command. The failure to reasonably and adequately hire, retain, train and/or supervise allowed Zain's misconduct to continue unchecked; caused County employees to fail to catch and rely upon unreliable and falsified evidence; caused the County Prosecuting Attorney's Office to emphasize convictions over justice, at the expense of justice and individual rights; and prevented the many red flags surrounding Zain's qualifications, background, and continued retention even after his move to Texas from being seen as a problem.

### Mr. Gardner Was Maliciously Prosecuted and Wrongfully Convicted Based on the Use Of Zain Evidence

37.     In light of the backdrop described above, Mr. Gardner's wrongful conviction in 1990 and subsequent incarceration was no inadvertent mistake. It was caused by the conduct, patterns and practices of the Defendants and the intentional, bad faith, or alternatively, reckless acts of the Defendants' employees and agents.

38.     According to the evidence at trial, in 1987, two women—Ms. Galati and Ms. Ferrell—were attacked in their home in Kanawha County, West Virginia (the "Galati assault") and another woman—Ms. Ruckman—was attacked in her home, also in Kanawha County (the "Ruckman assault"). Based on witness accounts, police and prosecutors concluded both attacks were committed by the same person: an African American male with medium-toned skin, a

slender nose, and of medium build who stood about 6 feet tall.  Mr. Gardner, in contrast, stands nearly at 6 feet and 4 inches and has a dark complexion.

39.    The Charleston Police Department interviewed and fingerprinted over one hundred of local African American men, including many members of the Charleston Wheelers minor league baseball team.  At the time, Mr. Gardner was a starting pitcher for that team.  Mr. Gardner and his teammates cooperated with the investigation and documented their alibis.

40.    Police officers compared Mr. Gardner's fingerprint to the prints recovered from the crime scenes and determined they did not match.  Mr. Gardner also did not match the description of the perpetrator of the crimes, and he had an alibi for the time of each incident.

41.    Defendants received information from the victims of the Galati and Ruckman assaults that Mr. Gardner was not their assailant or that they could not identify Mr. Gardner as their assailant.  Not all records of these non-identifications and surrounding communications and events were turned over to Mr. Gardner's attorneys even though this information clearly would have been helpful to Mr. Gardner's defense, violating his right to due process.

42.    Two years later, in 1989, police officers changed their position and now argued that Mr. Gardner's fingerprint matched a fingerprint they claimed was recovered from a vase at the Galati residence—an object the perpetrator was not alleged to have touched.

43.    This fingerprint "match" was unreliable for many reasons and the Defendants knew it could not sustain a jury verdict.  For example, according to the victim, the perpetrator touched many other objects at the scene but she did not see the perpetrator touch the vase.  None of the other prints collected from either crime scene matched Mr. Gardner, including prints on objects the perpetrator was seen to have handled. The supposed evidence was not appropriately handled, and the chains of custody for the fingerprint card, the original source of the print, and

10

photograph of the print were disrupted and unreliable. There also were unexplained discrepancies in how the fingerprint was described over time, including as to which finger made the print (thumb vs. middle finger) and how many prints were reflected in the evidentiary photograph (one versus two). In addition, Mr. Gardner was originally cleared and determined to not be a match to any of the collected prints as they existed in evidence two years prior.

44.     The Charleston Police Department was responsible for causing an inaccurate and unreliable, and possibly even faked and fraudulent, fingerprint record to be created in this case. Members of the Charleston Police Department also did not have sufficient training, supervision and expertise to handle the evidentiary materials in question.

45.     Police questioned Mr. Gardner who voluntarily provided a blood sample because he knew he had nothing to hide. Police and prosecutors provided this blood sample to the State Police crime laboratory.

46.     The County Prosecuting Attorney's Office—including Defendants Forbes, Whitmyer, and Frail—initiated a prosecution of Mr. Gardner based upon the unreliable fingerprint and serology evidence. At the time, the Defendants knew or should have known that the evidence was unreliable, would not establish probable cause if truthfully presented to a judge, and could not sustain a conviction if truthfully presented to a jury.

47.     Nonetheless, Mr. Gardner was indicted in May of 1989 on nine counts stemming from the Galati and Ruckman assaults.

48.     At trial, the County Prosecuting Attorney's Office—including Defendants Forbes, Whitmyer, and Frail—placed primary reliance on purported expert testimony from Zain about serology (bodily fluid) comparisons. According to Zain, serology tests of recovered evidence allegedly (1) did not exclude Mr. Gardner as the perpetrator, (2) included him within a narrow

class of potential perpetrators of the supposedly-related Ruckman assault, of which Mr. Gardner was acquitted, and (3) supposedly excluded the main alternate suspect who had been identified by one of the victims.

49.     Zain's testimony at Mr. Gardner's trial was materially incorrect because it falsely included Mr. Gardner within the population of potential suspects and falsely excluded the key alternate suspect from that population.

50.     Zain inconsistently claimed in his sworn testimony that due to the small sample size, the biological matter he analyzed could not be sourced to either the victim or the perpetrator, thus preventing Mr. Gardner from being excluded as a suspect, even though the same sample was supposedly sufficient to exclude the alternate suspect, and even though Zain's purported laboratory reports had concluded that the biological matter came from the perpetrator.

51.     Based on the information in their possession at the time, the County Prosecuting Attorney's Office—including Defendants Forbes, Whitmyer, and Frail—knew or should have known about the discrepancies and falsehoods in Zain's testimony, yet they allowed that false testimony to remain uncorrected, if not actively suborned, and they emphasized the importance of that testimony in closing arguments.

52.     Later, in 1995, then-West Virginia State Police Public Safety Director Ted Smith presented newly discovered documentation to Mr. Gardner's attorney.  Significantly, the new documentation included raw data sheets compiled by three other West Virginia State Police serologists—T.A. Smith, J.A. Bowles, and H.B. Myers—that conclusively excluded Mr. Gardner based on his blood type alone.

53.     Throughout his trial and to this day, Mr. Gardner has steadfastly maintained his innocence.  Mr. Gardner had alibis for the time of both attacks.  Mr. Gardner did not match the

descriptions provided by the victims.  Mr. Gardner also was not identified by the victims either before or at trial.

54.     Ultimately, Mr. Gardner was wrongfully convicted of sexual assault, aggravated robbery, felony assault, and breaking and entering in connection with the Galati assault. However, he was acquitted of charges stemming from the separate Ruckman assault that the County Prosecuting Attorney's Office maintained was committed by the same perpetrator.

55.     Mr. Gardner was sentenced to serve up to 110 years of incarceration by West Virginia—a sentence far longer than an ordinary lifetime.

56.     Mr. Gardner futilely challenged his wrongful conviction at every turn.  At trial, he moved the trial court to set aside the verdict and to grant a new trial as being contrary to the law and evidence, but those motions were denied.  Mr. Gardner then noticed his intent to appeal the conviction and petitioned for an appeal, but his request was refused.

### The State's Reliance on Falsified Evidence Was Revealed

57.     Eventually, a West Virginia Supreme Court special investigation, spurred by an exoneration in an unrelated case, revealed that Zain had regularly falsified his data and testimony in as many as 134 criminal cases.  Many of these cases were brought by the Kanawha County Prosecuting Attorney's Office as part of their pattern and practice of retaining unreliable, unvetted, and unqualified experts.

58.     In 1993, the Court ruled that all Zain Evidence was unreliable and unable to support a conviction.  The Court's opinion adopting the investigation report concluded that Trooper Zain had a "long history of falsifying evidence in criminal prosecutions."  *In re Investigation of W.V. State Police Crime Lab., Serology Div.,* 438 S.E.2d 501, 503 (W.V. 1993).

59.     The West Virginia Supreme Court agreed that "Zain's pattern and practice of misconduct completely undermined the validity and reliability of any forensic work he performed or reported . . . ."  *Id.* at 504.

60.     The West Virginia Supreme Court explained that the matters before the Court "are shocking and represent egregious violations of the right of a defendant to a fair trial.  They stain our judicial system and mock the ideal of justice under law."  *Id*. at 508.

61.     Accordingly, the West Virginia Supreme Court ordered that special post-conviction consideration should be given to all affected defendants.  The West Virginia Supreme Court concluded that "[t]he State must bear the responsibility for the false evidence" even if prosecutors did not know that their expert was falsifying evidence.  438 S.E.2d at 505.

62.     The Court agreed with the report that "as a matter of law, any testimonial or documentary evidence offered by Zain at any time in any criminal prosecution should be deemed invalid, unreliable, and inadmissible in determining whether to award a new trial in any subsequent habeas proceeding."  *Id.* at 506.  The Court concluded that each defendant in a case involving Zain evidence should be allowed to seek State habeas relief, and that the question in each case was whether the remaining evidence, independent of the Zain evidence, would have been sufficient to support the verdict.  *Id.* at 506.

63.     The West Virginia Supreme Court also directed prosecutors to investigate Zain for violations of criminal law.  438 S.E.2d at 508.

64.     In 1998, Zain was indicted in the Circuit Court of Kanawha County, West Virginia, for obtaining money under false pretenses.  Count Five (V) of Zain's indictment was based on the materially false testimony he knowingly rendered in Mr. Gardner's case.  After a health-related delay, Zain was re-indicted in 2001.  The corresponding trial ended in a mistrial

after the jury deadlocked.  Zain passed away from liver cancer in 2002 before he could be retried.

65.     Additional investigations confirmed that Zain did not have an appropriate or reliable academic background for the positions he held, including substandard performance in courses such chemistry which are critical to competence as a serologist.

66.     Zain's former State laboratory colleagues knew about Zain's penchant for falsifying data and testimony and refused to stand by his work.  On information and belief, this information was conveyed to one or more members of the County Prosecuting Attorney's Office. Nonetheless, the County Prosecuting Attorney's Office kept Zain enrolled as a contractor and continued to bring Zain back to West Virginia to testify as an expert even after he had left his employment with the West Virginia State Police.

67.     The County Prosecuting Attorney's Office did not disclose the negative information about Zain's background and faulty performance to defense counsel at the time of trial, even though it would have been helpful—and indeed *crucial*—to Mr. Gardner's defense and thus was required to be disclosed pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.

68.     Each of the Defendants to this action bears liability for some of all of Mr. Gardner's damages alleged herein, including for their own conduct; for the conduct, patterns, practices and policies of their offices; and for their collaboration and/or conspiracy with other Defendants who are responsible for the actions described herein.

### Mr. Gardner's Diligent Efforts to Obtain Relief

69.     In December 1993, one month after the West Virginia Supreme Court opinion on the unreliability of Zain Evidence, Mr. Gardner petitioned the Circuit Court of Kanawha County for state habeas corpus relief.

70.     Under the West Virginia Supreme Court's opinion, Mr. Gardner's case should have been reviewed to determine whether there was sufficient evidence to uphold the conviction. 438 S.E.2d at 506.   Nonetheless, over the next twenty years, Mr. Gardner never received the required hearings or rulings from the state court.

71.     Initially, Mr. Gardner's petition was summarily denied.   The West Virginia Supreme Court reversed and ordered that a full evidentiary hearing be conducted.

72.     At an April 21, 1995 hearing, prosecutors moved for an order for DNA testing. An outside laboratory then returned its findings alleging that bodily fluids at the crime scenes were consistent with Gardner's DNA.   However, no further explanation was provided as to where these samples originated or as to discrepancies in Mr. Gardner's blood type in light of the previous findings that the donor of the fluid samples had a *different* blood type than Mr. Gardner. Additional DNA motion practice followed in the state court.

73.     Ultimately, the West Virginia Supreme Court ordered the Circuit Court to conduct a full hearing on Mr. Gardner's case on at least three occasions—March 1, 1995, July 2, 2002, and November 29, 2005—but such hearings never materialized.   Incredibly, after more than 20 years, Mr. Gardner still had not received a ruling by the state court on his state habeas claim.

74.     At least part of this delay was due to acts and omissions of the County Prosecuting Attorney's Office.

75.     Mr. Gardner eventually pursued a federal writ of habeas corpus and was excused from exhausting state remedies due to the "extraordinary circumstance" of the state's 20-year inordinate delay.   *Gardner v. Plumley*, No. 2:12-cv-03386, 2013 WL 5999041, at *7 (S.D.W.V. Nov. 12, 2013).

76.     In 2016, the federal court issued a scathing opinion about the "mockery of justice" and "complete miscarriage of justice" arising from Mr. Gardner's wrongful conviction based on the Defendants' use of false testimony and "the state circuit court inexplicably allow[ing] his habeas petition to languish for over two decades." *Gardner v. Ballard*, 172 F. Supp. 3d 925, 927 (S.D.W.V. 2016).

77.     The federal court indicated that Mr. Gardner "has been in legal purgatory: the state courts have deprived him of the relief he seeks, but because they have not officially denied his petition on the merits, he has been unable to turn to the federal courts for relief." *Id.* at 928.

78.     The federal court found that Zain's trial testimony in Mr. Gardner's case was false, was critical to purportedly tying Gardner to the sexual assaults, and negated the jury's consideration of the most plausible alternate suspect.

79.     Ultimately, the federal court concluded with "absolutely no doubt that Zain's false testimony 'had a substantial and injurious effect on the jury's verdict,' which resulted in a complete miscarriage of justice." *Id.* at 940.

80.     The federal court ordered Mr. Gardner's wrongful convictions vacated and issued a writ of habeas corpus.  The federal court further ordered West Virginia to either retry or release Mr. Gardner within sixty days.

81.     Notwithstanding all of the foregoing, the County Prosecuting Attorney's Office announced that Mr. Gardner would still face retrial for the charges.  Defendants pushed for the retrial despite knowing that the available evidence was insufficient to support a conviction.

82.     At Mr. Gardner's 2016 pretrial proceedings, the defense proffered the testimony of a serologist and DNA expert witness, Theodore D. Kessis, Ph.D., who completely discredited Zain's summary and testimony used in Mr. Gardner's 1990 trial.  Dr. Kessis testified during

pretrial motions that the evidence alleged by Zain to be inculpatory actually exculpated Mr. Gardner.  Dr. Kessler further demonstrated that an additional DNA test, performed in 1996 and purporting to include Mr. Gardner's characteristics among samples taken from both victims, was wholly unreliable and inaccurate.  Nonetheless, the Prosecution continued to drive the case towards a retrial until literally days before the retrial was to begin.

83.     Ultimately, at a September 7, 2016 pretrial hearing in advance of a September 12 trial date, the County Prosecuting Attorney's Office announced it could not proceed on the remaining evidence and all charges were dismissed.

84.     The dismissal of charges against Mr. Gardner was entered on the docket on September 7, 2016.  Under the favorable termination rule, Mr. Gardner's claims did not accrue until the dismissal of his indictment.

## Mr. Gardner's Damages

85.     While incarcerated, Mr. Gardner experienced significant hardship, deprivation, and risk to his physical and psychological well-being, among other injuries.  He also missed out on decades of enjoyment of life, experiences and relationships.  Through this action, Mr. Gardner seeks damages in an amount not less than $25 million.

86.     As criminal justice scholars have explained, though the psychological effects of incarceration vary, "few people are completely unchanged or unscathed by the experience. At the very least, prison is painful, and incarcerated persons often suffer long-term consequences from having been subjected to pain, deprivation, and extremely atypical patterns and norms of living and interacting with others." *See* Craig Haney, *The Psychological Impact of Incarceration: Implications for Post-Prison Adjustment*, at 79, prepared for the symposium *From Prison to Home*, U.S. DEPT. OF HEALTH & HUMAN SERVS., Jan. 30-31, 2002.

18

87.     Scholars have also explained, "[l]ike all processes of gradual change, of course, [prisonization, i.e., the negative psychological effects of imprisonment] typically occurs in stages and, all other things being equal, the longer someone is incarcerated the more significant the nature of the institutional transformation.  When most people first enter prison, of course, they find that being forced to adapt to an often harsh and rigid institutional routine, deprived of privacy and liberty, and subjected to diminished, stigmatized status and extremely sparse material conditions is stressful, unpleasant and difficult.  However, in the course of becoming institutionalized, a transformation begins.  Persons gradually become more accustomed to the restrictions that institutional life imposes.  The various psychological mechanisms that must be employed to adjust (and, in some harsh and dangerous correctional environments, to survive) become increasingly 'natural,' second nature, and, to a degree, internalized." *Id.* at 80.

88.     In addition, "[a]mong other things, the process of institutionalization (or 'prisonization') includes some or all of the following psychological adaptations including dependence on institutional structure and contingencies; hypervigilance, interpersonal distrust and suspicion; emotional over-control, alienation and psychological distancing; social withdraw and isolation; incorporation of exploitative norms of prison culture; diminished sense of self-worth and personal value; and post-traumatic stress reactions to the pains of imprisonment." *Id.* at 80-81.

89.     As a direct and proximate cause of the Defendants' unlawful, intentional, reckless, and/or bad faith acts and omissions, or grossly negligent conduct, Mr. Gardner was falsely arrested and imprisoned, unfairly tried, wrongfully convicted, and forced to serve more than twenty-six years in prison by West Virginia for a crime he did not commit.

90.     In all, the Defendants' wrongful arrangement for and reliance on falsified evidence caused Mr. Gardner to be wrongfully convicted and incarcerated from 1989 until April 1, 2016, including two years in Florida after revocation of Mr. Gardner's youthful offender status.

91.     Adding insult to his injury, Mr. Gardner was forced to face limitations on his freedom and liberty pursuant to bond conditions imposed between April 1, 2016 and September 7, 2016 while he awaited retrial.  Among other provisions, Mr. Gardner was subjected to bond in the amount of $10,000 with a ten percent cash option, subjected to travel restrictions, and barred from possessing any dangerous weapons, such as firearms.

92.     The patterns, practices, policies, and conduct of the Defendants, themselves and by their employees and trial witnesses, deprived Mr. Gardner of his civil rights under the Fourteenth Amendment to the United States Constitution.

93.     The Defendants' wrongful patterns, practices, policies, and conduct actually and proximately caused Mr. Gardner to suffer and endure false detention and false imprisonment; physical pain, anguish, and distress; personal and physical injuries; suffering including indignities, embarrassment, degradation and humiliation; severe mental pain, anguish, and emotional distress; violation of his constitutional rights; loss of educational opportunities; loss of job training, employment and benefits; diminished earning capacity; loss of social status; loss of experiences and opportunities; restrictions on personal freedoms; monetary damages; and other injuries from the loss of liberty from 1989 through 2016 and beyond.

94.     As experts have explained, "[a]mong other things, penal institutions require inmates to relinquish the freedom and autonomy to make their own choices and decisions and this process requires what is a painful adjustment for most people.  Indeed, some people never

adjust to it." *See* Haney, *supra*, at 81.  Specifically, Mr. Gardner was forced to relinquish his personal freedom and autonomy as a direct and proximate result of the Defendants' wrongful conduct.

95.     In addition, as experts have explained, "because many prisons are clearly dangerous places from which there is no exit or escape, prisoners learn quickly to become hypervigilant and ever-alert for signs of threat or personal risk.  Because the stakes are high, and because there are people in their immediate environment poised to take advantage of weakness or exploit carelessness or inattention, interpersonal distrust and suspicion often result." *Id.* During his incarceration and as a consequence of the Defendants' wrongful conduct, Mr. Gardner was forced to assume a constant posture of hypervigilance, distrust, and suspicion—a state of being foreign and unfamiliar to Mr. Gardner before his wrongful incarceration.

96.     As noted in the above-referenced literature, one prison administrator has described prison as a "barely controlled jungle where the aggressive and the strong willed exploit the weak, and the weak are dreadfully aware of it." *Id.* at 82.  As experts have further explained, "[p]risoners who labor at both an emotional and behavioral level to develop a 'prison mask' that is unrevealing and impenetrable risk alienation from themselves and others, may develop emotional flatness that becomes chronic and debilitating in social interaction and relationships, and find that they have created a permanent and unbridgeable distance between themselves and other people.  Many for whom the mask becomes especially thick and effective in prison find that the disincentive against engaging in open communication with others that prevails there has led them to withdraw from authentic social interaction altogether.  The alienation and social distancing from others is a defense not only against exploitation but also against the realization that the lack of interpersonal control in the immediate prison environment makes emotional

investments risky and unpredictable." *Id.* at 82.  While living in this jungle, Mr. Gardner suffered negative impacts to his emotional health and well-being.

97.     Even further, as experts have explained, "[s]ome prisoners learn to find safety in social invisibility by becoming as inconspicuous and unobtrusively disconnected from others as possible.  The self-imposed social withdrawal and isolation may mean that they retreat deeply into themselves, trust virtually no one, and adjust to prison stress by leading isolated lives of quiet desperation.  In extreme cases, especially when combined with prisoner apathy and loss of the capacity to initiate behavior on one's own, the pattern closely resembles that of clinical depression.  *Long-term prisoners are particularly vulnerable to this form of psychological adaptation*." *Id.* at 82 (emphasis added).  As a direct and proximate result of the Defendants' wrongful patterns, practices, policies, and conduct resulting in Mr. Gardner's wrongful incarceration, Mr. Gardner endured under a constant and ever-present threat to his safety requiring that he socially withdraw as an act of personal protection and survival.  The length of Mr. Gardner's incarceration only exacerbated this condition.

98.     Lastly, experts have explained that "[t]he psychological consequences of incarceration may represent significant impediments to post-prison adjustment.  They may interfere with the transition from prison to home, impede an ex-convict's successful re-integration into a social network and employment setting, and may compromise an incarcerated parent's ability to resume his or her role with family and children." *Id.* at 86.  Mr. Gardner's suffering did not end when his period of incarceration ceased.  Indeed, as a direct and proximate cause of the Defendants' wrongful pattern, practices, policies, and conduct resulting in Mr. Gardner's wrongful incarceration, Mr. Gardner continues to suffer and face difficulty re-integrating into society, forming a social network, and reestablishing relationships with his

family, his child, and his grandchild.  Indeed, his struggles, his pain, and his persecution will follow him each and every day of his life.

## COUNT I
## Redress for Deprivation of Rights Pursuant to 42 U.S.C. § 1983

99.     Mr. Gardner incorporates all prior allegations as if alleged herein.

100.     At Mr. Gardner's criminal trial in 1990, the prosecution's expert witness, former State Police serologist Fred Zain, presented false testimony under oath that unquestionably had a substantial and injurious effect on the jury's verdict.  This violated Mr. Gardner's right to due process under the Fourteenth Amendment to the United States constitution.  A due process violation occurs when the prosecution convicts a defendant based upon false evidence, regardless of whether the prosecutor is aware of its falsity.  *See, e.g.*, *Giglio v. United States*, 405 U.S. 150 (1972).  When the prosecution has presented false evidence, the conviction must be vacated and habeas relief granted unless the prosecution can show that the error would not have had a "substantial and injurious effect or influence in determining the jury's verdict."  *Brecht v. Abramson*, 507 U.S. 619, 637 (1993).  These rights are clearly established, and a reasonable person would not believe that conduct violating such rights is lawful.

101.     The Defendants' policies, patterns, practices, and conduct in the years leading up to Mr. Gardner's conviction, particularly 1985 to 1999, presented a known and unreasonable risk of constitutional violations for affected defendants.  Indeed, the Defendants' policies, patterns, practices, and conduct in the years leading up to Mr. Gardner's conviction resulted directly and proximately in Zain's false testimony being used in Mr. Gardner's case and in Mr. Gardner's wrongful conviction.

102.    The Defendants also did not disclose the negative information about Zain's background and faulty performance to defense counsel at the time of trial, even though it would have been helpful—and indeed *crucial*—to Mr. Gardner's defense and thus was required to be disclosed pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.  This also led to the violation of Mr. Gardner's Fourteenth Amendment right to due process.

103.    The County Prosecuting Attorney's Office, including Defendant Forbes, Whitmyer, and Frail, were responsible for these activities.

104.    The use of Zain evidence in Mr. Gardner's trial, and concealment of its faults, was part of a widespread pattern, practice and policy—rising to the level of an official policy and custom—by the County Prosecuting Attorney's Office of approving and using an unreliable, unvetted, and unqualified expert to obtain convictions.  The County Prosecuting Attorney's Office used Zain evidence in multiple cases, even after Zain had left the West Virginia State Police and had to be flown back in from Texas in order to provide the "better" testimony and results, and even after the State Police's own laboratory experts concluded Zain's results were unreliable and could not be testified to at trial.  The County Prosecuting Attorney and members of his office, including Defendants Forbes, Whitmyer and Frail, knew or should have known about these activities and the risks and warning signs associated with them even before the prosecution in Mr. Gardner's case.  Defendants' conduct, policies, patterns and practices directly led to the violation of Mr. Gardner's Fourteenth Amendment right to due process.

105.    The County Prosecuting Attorney made decisions and set policy regarding the approval, enrollment and use of expert witnesses like Zain, but failed to provide adequate screening, training, and supervision and failed to adopt needed policies, with deliberate indifference to the fact that a violation of federal rights is a highly predictable consequence.

Better screening, training and supervision could have directly prevented the harm in this case. These failures also directly led to the violation of Mr. Gardner's Fourteenth Amendment right to due process.

106.    In approving Zain as a contractor and enrolling him as a contractor and vendor, as well as through activities related to Zain in individual cases, the County Prosecuting Attorney's Office and other Defendants were acting under color of state law, clothed with the power of the state for the enforcement of state law.  These activities included significant administrative functions and decisions to which prosecutorial immunity would not apply.

107.    The Charleston Police Department was responsible for causing an inaccurate and unreliable, and possibly even faked and fraudulent, fingerprint record to be created in this case. Members of the Charleston Police Department also did not have sufficient training, supervision and expertise to handle the evidentiary materials in question, and the Charleston Police Department had a pattern and practice of allowing unqualified or underqualified persons to handle and examine evidence in a way that infringed the defendants' right to a fair trial.  These activities also led to the violation of Mr. Gardner's Fourteenth Amendment right to due process.

108.    As an actual and proximate result of his wrongful conviction and incarceration, Mr. Gardner has sustained substantial injuries and damages arising from his loss of liberty, including, but not limited to, the following:

    a.   Money spent in defending against these charges;

    b.   Emotional pain and suffering, past and future;

    c.   Physical pain and suffering, past and future;

    d.   Violation of his constitutional rights;

    e.   Loss of experiences and opportunities;

f.   Loss of social status and reputation in the community;

g.   Loss of ability to enjoy life;

h.   Loss of educational opportunities and job training, employment and benefits;

i.   Restrictions on personal freedoms;

j.   Restrictions on access to health care;

k.   Diminished earning capacity;

l.   Monetary damages; and

m.  Substantial other injuries for which Mr. Gardner is entitled to recovery.

109.    Mr. Gardner seeks an award of damages that is sufficient to fairly and reasonably compensate him for his injuries and damages, as well as punitive damages, attorney fees, and interest as available, and such other and further relief as is deemed just and proper.

## COUNT II
## Malicious Prosecution / Abuse of Process

110.    Mr. Gardner incorporates all prior allegations as if alleged herein.

111.    As discussed above, the County Prosecuting Attorney's Office initiated and prosecuted a criminal case against Mr. Gardner with the support and assistance of the other Defendants.

112.    The Defendants did not have probable cause to initiate the proceeding in light of the known unreliability of the evidence the County Prosecuting Attorney's Office was relying upon.  The County Prosecuting Attorney knew or should have known about the unreliability of such evidence.  The indictment against Mr. Gardner was obtained by fraud, perjury or other corrupt means with the purpose of obtaining a conviction and inflating closure rates without regard to actual innocence or justice, all resulting in significant harm to Mr. Gardner.

26

113.    In addition, the Defendants continued the prosecution of Mr. Gardner with a threatened re-trial even after further evidence of Zain's wrongdoing emerged and it was clear Defendants would not be able to obtain a conviction.  This was an abuse of process, with an improper motive and for improper purposes of trying to leverage plea negotiations, obtain a conviction, and inflate closure rates without regard to actual innocence or justice, which resulted in significant harm to Mr. Gardner.

114.    In September 2016, the indictment against Mr. Gardner was dismissed, thereby terminating the proceeding in Mr. Gardner's favor.

115.    In prosecuting Mr. Gardner based on the unreliable evidence and continuing such prosecution even without inculpatory evidence and as the exculpatory evidence increased, the Defendants were acting maliciously and for a purpose other than bringing the actual perpetrator to justice, namely obtaining convictions for the sake of "winning" or in order to pad its closure rate, without regarding to actual innocence or justice.  The Defendants demonstrated they were more interested in a conviction than in dispensing justice.

116.    As an actual and proximate result of his unjust conviction and imprisonment, Mr. Gardner has sustained substantial injuries and damages arising from the malicious prosecution, abuse of process, and resulting loss of liberty, including, but not limited to, the following:

a.   Money spent in defending against these charges;

b.   Emotional pain and suffering, past and future;

c.   Physical pain and suffering, past and future;

d.   Violation of his constitutional rights;

e.   Loss of experiences and opportunities;

f.   Loss of social status and reputation in the community;

g.   Loss of ability to enjoy life;

h.   Loss of educational opportunities and job training, employment and benefits;

i.   Restrictions on personal freedoms;

j.   Restrictions on access to health care;

k.   Diminished earning capacity;

l.   Monetary damages; and

m.   Substantial other injuries for which Mr. Gardner is entitled to recovery.

117.    Mr. Gardner seeks an award of damages that is sufficient to fairly and reasonably compensate him for his injuries and damages, as well as punitive damages, attorney fees, and interest as available, and such other and further relief as is deemed just and proper.

<u>**COUNT III**</u>
<u>**Unjust Conviction and Imprisonment Under Common Law**</u>

118.    Mr. Gardner incorporates all prior allegations as if alleged herein.

119.    At Mr. Gardner's criminal trial in 1990, the expert witness presented by the County Prosecuting Attorney's Office—former State Police serologist Fred Zain—knowingly presented false testimony under oath that unquestionably had a substantial and injurious effect on the jury's verdict.  The Defendants knew or should have known that Zain's testimony would likely be and in fact was false.  The Defendants also knew or should have known that the supposed fingerprint record created and used in this case was inaccurate and unreliable, and even possible faked and fraudulent, due to the actions and activities of the Charleston Police Department.

120.    On March 5, 1990, Mr. Gardner was wrongfully convicted and sentenced for four felonies against the State of West Virginia including sexual assault, aggravated robbery, felony assault, and breaking and entering.

121.    Mr. Gardner served a portion of his West Virginia sentence of confinement.  In particular, he served two years in Florida after his youthful offender work release status was revoked, and then was confined by West Virginia from around March 1992 to April 1, 2016.

122.    Mr. Gardner's judgment of conviction ultimately was vacated.

123.    A new trial was ordered, but Mr. Gardner was not retried.

124.    Ultimately the accusatory instrument was dismissed.

125.    Under these facts, Mr. Gardner is entitled to an award of damages.

126.    As an actual and proximate result of his unjust conviction and imprisonment, Mr. Gardner has sustained substantial injuries and damages arising from his loss of liberty, including, but not limited to, the following:

a.   Money spent in defending against these charges;

b.   Emotional pain and suffering, past and future;

c.   Physical pain and suffering, past and future;

d.   Violation of his constitutional rights;

e.   Loss of experiences and opportunities;

f.   Loss of social status and reputation in the community;

g.   Loss of ability to enjoy life;

h.   Loss of educational opportunities and job training, employment and benefits;

i.   Restrictions on personal freedoms;

j.   Restrictions on access to health care;

k.  Diminished earning capacity;

l.  Monetary damages; and

m.  Substantial other injuries for which Mr. Gardner is entitled to recovery.

127.    Mr. Gardner seeks an award of damages that is sufficient to fairly and reasonably compensate him for his injuries and damages, as well as punitive damages, attorney fees, and interest as available, and such other and further relief as is deemed just and proper.

## COUNT IV
### Negligent Hiring, Retention and Supervision

128.    Mr. Gardner incorporates all prior allegations as if alleged herein.

129.    The Charleston Police Department was responsible for causing an inaccurate and unreliable, and possibly even faked and fraudulent, fingerprint record to be created in this case. Members of the Charleston Police Department did not have sufficient training, supervision and expertise to handle the evidentiary materials in question.

130.    The County Prosecuting Attorney approved Zain as a contractor and vendor and retained Zain as an expert witness in various cases after he left the West Virginia State Police.

131.    Prior to approving Zain as a contractor and vendor and prior to retaining Zain in various cases, the County Prosecuting Attorney's Office, including Defendants Forbes, Whitmyer and Frail, failed to adequately investigate and vet Zain's educational background and credentials, performance, experience, and fitness to perform the duties of a serologist.

132.    Subsequently, the County Prosecuting Attorney's Office, including Defendants Forbes, Whitmyer and Frail, retained Zain as a serologist expert witness in Mr. Gardner's trial.

133.    Prior to retaining Zain as an expert witness, the County Prosecuting Attorney's Office, including Defendants Forbes, Whitmyer and Frail, failed to adequately investigate and

vet Zain's educational background and credentials, performance, experience, and fitness as a serology expert.

134.    Zain did not have the appropriate educational background and credentials, performance, experience, and fitness to perform the duties of a serologist or expert witness.

135.    Prior to Mr. Gardner's trial, the County Prosecuting Attorney's Office knew or should have known that Zain did not have the appropriate background credentials to perform the duties of a serologist or expert witness.

136.    Zain willfully and deliberately provided false and misleading testimony regarding the findings of his serology investigation pursuant to his retention by the County Prosecuting Attorney's Office.

137.    Defendants knew or should have known that Zain had a systematic practice of providing false data, evidence, and testimony.

138.    Defendants relied on false evidence and testimony of Zain in their wrongful prosecution of Mr. Gardner.

139.    Defendants had a duty to take proper and reasonable precautions when hiring, retaining and supervising employees and contractors.

140.    Defendants were negligent and/or grossly negligent in that their conduct breached reasonable standards of care and, indeed, reflected a reckless indifference and disregard for the likelihood of risk to persons like Mr. Gardner.

141.    As an actual and proximate result of the Defendants' wrongful conduct, Mr. Gardner has sustained substantial injuries and damages arising from his loss of liberty, including, but not limited to, the following:

    a.   Money spent in defending against these charges;

b.  Emotional pain and suffering, past and future;

c.  Physical pain and suffering, past and future;

d.  Violation of his constitutional rights;

e.  Loss of experiences and opportunities;

f.  Loss of social status and reputation in the community;

g.  Loss of ability to enjoy life;

h.  Loss of educational opportunities and job training, employment and benefits;

i.  Restrictions on personal freedoms;

j.  Restrictions on access to health care;

k.  Diminished earning capacity;

l.  Monetary damages; and

m.  Substantial other injuries for which Mr. Gardner is entitled to recovery.

142.    The County Prosecuting Attorney's Office should have reasonably foreseen the risk of the above-listed harms caused by approving Zain as a contractor and an expert and by retaining him as an expert witness in Mr. Gardner's trial.

143.    Mr. Gardner seeks an award of damages that is sufficient to fairly and reasonably compensate him for his injuries and damages, as well as punitive damages, attorney fees, and interest as available, and such other and further relief as is deemed just and proper.

## COUNT V
### Intentional Infliction of Emotional Distress

144.    Mr. Gardner incorporates all prior allegations as if alleged herein.

145.   The Defendants engaged in atrocious and intolerable conduct when they relied upon unreliable testimony and evidence, including the testimony proffered by Zain, which evidence and testimony the Defendants knew or should have known was unreliable and false.

146.   The Defendants acted recklessly with full knowledge that Mr. Gardner would suffer substantial and certain emotional distress as a direct and proximate result of a wrongful conviction and incarceration based upon evidence that the Defendants knew or should have known was false.

147.   As an actual and proximate result of the Defendants' outrageous, atrocious, and intolerable conduct, Mr. Gardner suffered severe emotional distress from being deprived of his interests in life and liberty resulting from his unjust prosecution and wrongful incarceration for more than twenty-six years.

148.   No reasonable person can be expected to endure the severe emotional distress of being deprived of their interests in life and liberty as a result of unjust prosecution and wrongful incarceration for more than twenty-six years.

149.   As an actual and proximate result of the Defendants' wrongful conduct, Mr. Gardner has sustained substantial injuries and damages arising from his loss of liberty, including, but not limited to, the following:

      a.   Money spent in defending against these charges;

      b.   Emotional pain and suffering, past and future;

      c.   Physical pain and suffering, past and future;

      d.   Violation of his constitutional rights;

      e.   Loss of experiences and opportunities;

      f.   Loss of social status and reputation in the community;

g.   Loss of ability to enjoy life;

h.   Loss of educational opportunities and job training, employment and benefits;

i.   Restrictions on personal freedoms;

j.   Restrictions on access to health care;

k.   Diminished earning capacity;

l.   Monetary damages; and

m.   Substantial other injuries for which Mr. Gardner is entitled to recovery.

150.   Mr. Gardner seeks an award of damages that is sufficient to fairly and reasonably compensate him for his injuries and damages, as well as punitive damages, attorney fees, and interest as available, and such other and further relief as is deemed just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Mr. Gardner prays for relief against each and every Defendant listed herein.  Mr. Gardner requests an award of damages in an amount not less than $25 million that is sufficient to fairly and reasonably compensate him for the injuries suffered based upon this wrongful arrest, wrongful conviction and incarceration, as well as punitive damages, attorney fees, and interest as available, and such other and further relief as is deemed just and proper.

## JURY DEMAND

Plaintiff requests a trial by jury on all issues so-triable.


Respectfully submitted,


Jimmie C Gardner, Petitioner

By Counsel:

 /s/ Robert P. Dunlap, II_____
ROBERT P. DUNLAP, II (W.V. State Bar #10012)
208 Main Street
Beckley, WV 25801
Phone: 304-255-4762
Fax: 304-255-4760
Email: robertdunlapesq@gmail.com