UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

JIMMIE C. GARDNER,

        Plaintiff,

v.                                   Civil Action No. 2:17-cv-03934

KANAWHA COUNTY, WEST VIRGINIA;
KANAWHA COUNTY COMMISSION;
KANAWHA COUNTY PROSECUTING
ATTORNEY, in his official
capacity; WILLIAM C. FORBES;
REAGAN E. WHITMYER; JOHN J.
FRAIL; and CHARLESTON POLICE
DEPARTMENT,

        Defendants.


<u>MEMORANDUM OPINION AND ORDER</u>


        Pending are two motions to dismiss, one by defendant William C. Forbes filed on December 22, 2017; and one by defendants Kanawha County, West Virginia, Kanawha County Commission ("the County Commission"), Kanawha County Office of Prosecuting Attorney ("Prosecuting Attorney" or "Prosecuting Attorney's Office"), Reagan E. Whitmyer, and John J. Frail

(collectively, "Kanawha County Defendants") filed on January 2, 2018.[1]

Although listed as separate defendants, the court notes that Kanawha County, West Virginia is not a separate suable entity from the County Commission.  Rather, the County Commission is the entity through which the County acts and may be sued.  See W. Va. Code Ann. § 7-1-1 ("The county commission . . . of every county within the State of West Virginia shall be a corporation by the name of "The County Commission of . . . . . . . . . County", . . . by which name it may sue and be sued, plead and be impleaded and contract and be contracted with.")  Moreover, there are no allegations in the complaint which differentiate between the two parties, nor is the issue presented by any of the parties.  The court accordingly refers to both parties as "the County Commission," and Kanawha County, West Virginia is not deemed a separate party, but is rather dismissed as a duplicative party.

---

[1] The Charleston Police Department also filed a motion to dismiss.  On March 28, 2019, the court entered an agreed order dismissing the Charleston Police Department from this action pursuant to a settlement agreement with the plaintiff.  The Charleston Police Department is thus no longer a party in this action and their motion has been dismissed as moot.  See ECF # 54.

## I. Background

Jimmie C. Gardner is a citizen of the State of Georgia. (Compl. ¶ 2.) Each of the defendants is either a citizen or entity of the State of West Virginia. (See id. ¶¶ 3-9.) Particularly, Forbes served as the prosecuting attorney for Kanawha County and Whitmyer and Frail served as assistant prosecuting attorneys in Kanawha County. (Id. ¶¶ 6-8.)

### A. Procedural History

In 1987, three women were attacked in their homes, two in one instance on May 16, and the third on July 24, in the Kanawha City area of Charleston, West Virginia. Gardner v. Ballard, 172 F. Supp. 3d 925, 930 (S.D. W. Va. 2016), see Compl. ¶ 76. Police investigated "over one hundred suspects" including Gardner who was a pitcher for the Charleston Wheelers baseball team at the time. Id. "In May 1989, Gardner was indicted and subsequently tried in connection with attacks on two [of the] women." Id. at 929.

The salient evidence adduced at trial in the Circuit Court of Kanawha County included the expert testimony of Fred Zain, a serologist and a nonparty to this action who is deceased, and a fingerprint comparison. See id. at 931. The

fingerprint evidence had remained uncovered for nearly two years before Gardner's indictment: Gardner provided his fingerprints in August 1987, and investigators did not match Gardner's fingerprints to a print lifted from one of the crime scenes until May 1989.  See id. at 931-32.  Evidently, investigators had simply "missed [Gardner's] fingerprints" in 1987.  Id. at 931 n.7.  At any rate, West Virginia State Police Lieutenant David Shumate "testified [at trial that] 'the latent fingerprint from the vase is a print of the left middle finger of Jimmie Gardner.'"  Id. at 932.

As to one of the May 16th victims, Zain testified that his comparison of Gardner's blood sample with semen recovered from the victim revealed "that [Zain] could neither include nor exclude Gardner as the semen depositor[.]"  Id. at 933.  As to the victim of the July 24th attack, Zain testified that a comparison showed "that Gardner was included in the 0.18 percent of the population that could have been responsible for the semen[.]"  Id. at 935.  Zain further testified that a separate suspect -- identified by one of the victims as her attacker -- "was totally excluded as a possible semen donor in both cases."  Id.

On February 1, 1990, the jury convicted Gardner of sexual assault, robbery, felony assault, and breaking and entering stemming from the May 16th attack, but acquitted Gardner of the charges stemming from the July 24th attack.  Id. at 929.  On March 5, 1990, "Gardner was sentenced to an aggregate indeterminate term of 33 to 110 years in prison, of which he [ultimately] served more than 25 years."  Id.  Gardner appealed his conviction, which the Supreme Court of Appeals of West Virginia summarily denied.  Id. at 929 n.4.  Then, in December 1993, the Supreme Court granted Gardner habeas relief and remanded to the Circuit Court of Kanawha County following the state high court's adoption of an investigative report into the practices of Zain, explained in further detail below.  Id. at 929.  Gardner's case languished in the circuit court for about twenty-three years despite the Supreme Court, on three occasions, directing that court to grant Gardner a hearing.  Id.

On November 12, 2013, this court excused Gardner's requirement to exhaust state remedies before pursuing federal habeas relief.  Gardner v. Plumley, No. 2:12-cv-03386, 2013 U.S. Dist. LEXIS 160870, at *18 (S.D. W. Va. Nov. 12, 2013), see Compl. ¶ 75.  Finally, on March 25, 2016, this court granted Gardner's habeas petition, vacated his convictions, and ordered the State of West Virginia either to retry or release Gardner

within sixty days, as a result of which he was released.
Ballard, 172 F. Supp. 3d at 940-41, Compl. ¶¶ 80-84.  Now,
Gardner brings this action against the defendants.

    B. Allegations of the Complaint

        Zain was employed by the West Virginia State Police
("State Police"), a nonparty to this action, as a serologist
until July 1989 when he moved to Texas to continue working in
serology.  See Compl. ¶¶ 15, 23.  "For many years and across
dozens of cases, the Kanawha County Prosecuting Attorney's
Office used . . . Zain as an expert witness on their cases, as a
matter of pattern and practice, despite knowing or recklessly
disregarding information that Zain was not properly vetted,
lacked appropriate qualifications, and was regularly presenting
false testimony in criminal cases[.]"  Id. ¶ 15.

        "The West Virginia State Police knew as early as 1985
or earlier that Zain did not have appropriate academic
credentials to serve as a serology expert based on
correspondence received from the FBI."  Id. ¶ 19.  Similarly,
since sometime between 1985 and 1989, the Prosecuting Attorney
"knew or should have known that Zain did not have appropriate
credentials to serve as a serology expert in cases prosecuted by
th[e o]ffice."  Id. ¶ 20.  Gardner alleges that "[a]t all

relevant times, Kanawha County employees and County-sponsored
witnesses were not reasonably or adequately hired, retained,
trained and/or supervised, including" in all matters pertaining
to evidence.  See id. ¶ 36.

Some state troopers lodged complaints against Zain
between 1985 and 1989, telling the State Police that Zain "was
making improper and unjustified findings in the laboratory."
Id. ¶ 21.  In fact, "Zain became the subject of a 'magic wand'
joke –- Troopers would say Zain waved a magic wand because that
was the only way he could get the results he obtained."  Id.
During that same time period, the Prosecuting Attorney's Office,
including Forbes, Whitmyer, and Frail, "knew or should have
known that Zain's findings and testimony were not reliable and
that he should not be used as a serology expert in cases
prosecuted by th[e o]ffice."  Id. ¶ 22.

After Zain left the State Police in July 1989,
"laboratory personnel refused to stand by the results of work
Zain had done while with the State Police," and Trooper Ted
Smith, the Director of the Serology Division, "instructed lab
personnel to not automatically accept Zain's work and only
testify as to what they felt was supportable."  Id. ¶ 25.
Trooper Smith informed his superiors at the State Police of this
situation, and he also told "at least one member" of the

"Prosecuting Attorney's Office that the State Police were not standing behind Zain's work."  Id. ¶¶ 26, 66.

Nevertheless, under the direction of the Prosecuting Attorney's Office, Forbes, Whitmyer, and Frail, the Prosecuting Attorney's Office used Zain as an expert witness in criminal cases for many years both before and after Zain had moved to Texas and despite the clear warning signs that Zain was at least unreliable.  Id. ¶¶ 6-8, 15-16, 18, 27.  After Zain left the State Police, individuals within the Prosecuting Attorney's Office "began complaining that the results from the State Police laboratory were not as good -- i.e., not as incriminating -- as when Zain was there."  Id. ¶ 24.

Despite the availability of qualified State Police laboratory personnel, the Prosecuting Attorney's Office "pull[ed] evidence from the State Police laboratory and sen[t] it to Zain in Texas for testing," even if Zain was otherwise totally disconnected from the case.  Id. ¶ 28.  More than once, Zain produced "results more favorable for the prosecution" than the State Police laboratory based upon the same evidence.  Id. When "[State Police] laboratory personnel refused to testify to Zain's results, . . . [the] Prosecuting Attorney's Office, including Defendants Forbes, Whitmyer and Frail, flew Zain from Texas to West Virginia to testify in certain cases."  Id. ¶ 29.

The Prosecuting Attorney "is the policymaker and final decision-maker regarding the use of contracted expert witnesses and the policies and procedures for vetting and approving said experts." Id. ¶ 32. "[W]ith the assistance or knowledge of . . . Forbes, Whitmyer and Frail," the Prosecuting Attorney's Office repeatedly engaged Zain as a paid "contractor and vendor" to provide expert witness testimony. Id. ¶¶ 30-31. "By having Zain as an approved contractor, prosecutors were able to repeatedly call upon his services for various cases," including in Gardner's case, discussed below. Id. ¶ 30. The Prosecuting Attorney's Office "endorsed" retaining Zain with the knowledge that he provided "'better' results" when compared to State Police laboratory personnel. Id. ¶ 33. Moreover, the Prosecuting Attorney's Office "knew or should have known of Zain's history of presenting unreliable and fraudulent testimony." Id.

Later, in November 1992, the State Police superintendent sent a letter to Forbes "indicating that there were no further problems with Zain [e]vidence or related defendants." Id. ¶ 35. Although Forbes did not believe the superintendent and related his disbelief to others, "Forbes viewed this letter as a shield that protected him from future scrutiny." Id. He used the letter as pretext to "decline[] . .

. further follow-up on information indicating his office ha[d] been presenting false Zain evidence in many criminal cases including Mr. Gardner's." <u>Id.</u> "[He] instructed his assistant prosecutors to put a copy of the letter into every criminal file Zain had touched." <u>Id.</u>

Regarding the attacks on the three women in 1987, Gardner claims that his fingerprints did not match those at the crime scene, that he did not look like the perpetrator described by one of the victims, and that he had alibis for both incidents. <u>Id.</u> ¶¶ 40, 43, 53. In fact, in a separate proceeding before this court, "[Gardner] contend[ed] that after his trial, he was provided documents indicating the bloody fingerprint evidence was ruled to be inconclusive for a match to him during the investigation of the cases in 1987 and 1988." <u>Plumley</u>, at *3. Furthermore, the victims did not believe that Gardner was their assailant, or they otherwise could not identify him as such. Compl. ¶ 41, 53. The prosecutors did not turn over all of the records of these "non-identifications and surrounding communications" to Gardner's attorneys, despite possessing them and despite their clear helpfulness to Gardner's defense. <u>Id.</u> ¶ 41.

Moreover, Gardner alleges that the prosecutors knew that the fingerprint evidence could not sustain a jury verdict, and the match was dubious for a number of reasons: (A) the victim saw the perpetrator touch many objects in her home, but not the vase; (B) Gardner's fingerprints did not match any other fingerprints from the victim's home, "including prints on objects the perpetrator was seen to have handled;" (C) the fingerprint evidence "was not appropriately handled;" (D) "the chains of custody for the fingerprint card, the original source of the print, and photograph of the print were disrupted and unreliable;" (E) there were discrepancies "as to which finger made the print (thumb vs. middle finger) and how many prints were reflected in the evidentiary photograph (one versus two);" and (F) two years' prior, Gardner had been ruled out as a match to the collected fingerprints.  Compl. ¶ 43.  Gardner alleges that Charleston Police "caus[ed] an inaccurate and unreliable, and possibly even faked and fraudulent, fingerprint record to be created" and lacked the "training, supervision and expertise to handle the eviden[ce.]"  Id. ¶ 44.

Nevertheless, "based upon the . . . fingerprint and serology evidence," the Prosecuting Attorney's Office, Forbes, Whitmyer, and Frail indicted Gardner on nine counts related to the 1987 attacks.  Id. ¶¶ 46-47.  Gardner claims that, "[a]t the

time, the [d]efendants knew or should have known that the evidence was unreliable, would not establish probable cause if truthfully presented to a judge, and could not sustain a conviction if truthfully presented to a jury." Id. ¶ 46.

Gardner alleges that "Zain's [trial] testimony . . . was materially incorrect because it falsely included Mr. Gardner within the population of potential suspects and falsely excluded the key alternate suspect from that population." Id. ¶ 49. Further, Gardner claims that Zain's testimony was at least facially inconsistent: on the one hand, Zain suggested that Gardner could not be excluded as the perpetrator because the serological sample was too small to be sourced to Gardner or the victim; on the other hand, the sample size was apparently sufficient for Zain to exclude the alternate suspect and "conclude[] that the biological matter came from the perpetrator." Id. ¶ 50. Gardner asserts that the Prosecuting Attorney's Office, Forbes, Whitmyer, and Frail "knew or should have known about the discrepancies and falsehoods in Zain's testimony, yet they allowed that false testimony to remain uncorrected, if not actively suborned, and they emphasized the importance of that testimony in closing arguments." Id. ¶ 51. In addition, Gardner alleges that those defendants "did not disclose the negative information about Zain's background and

faulty performance to defense counsel at the time of trial, even though it would have been helpful -- and indeed crucial -- to Mr. Gardner's defense." Id. ¶ 67 (emphasis omitted).

In 1993, while Gardner was incarcerated, the Supreme Court of West Virginia completed an investigation into Zain, "spurred by an exoneration in an unrelated case." Id. ¶ 57. The investigation "revealed that Zain had regularly falsified his data and testimony in as many as 134 criminal cases," many of which were prosecuted by the Prosecuting Attorney. Id. ¶ 57.

The Supreme Court issued an opinion on the matter, In re Investigation of W. Va. State Police Crime Lab (Zain I), 438 S.E.2d 501 (W. Va. 1993), concluding that "Zain had a 'long history of falsifying evidence in criminal prosecutions;'" "that 'Zain's pattern and practice of misconduct completely undermined the validity and reliability of any forensic work he performed or reported;'" and "that the matters before the Court 'are shocking and represent egregious violations of the right of a defendant to a fair trial[,] . . . [and] stain our judicial system and mock the ideal of justice under law.'" Compl. ¶¶ 58-60 (quoting Zain I, 438 S.E.2d at 503-04, 508). Thus, "the [high court] ordered that special post-conviction consideration should be given to all affected defendants." Id. ¶ 61 (citing Zain I, 438 S.E.2d at 505). The Supreme Court of Appeals

instructed that "each defendant in a case involving Zain evidence should be allowed to seek State habeas relief, and that the question in each case was whether the remaining evidence, independent of the Zain evidence, would have been sufficient to support the verdict." Id. ¶ 62 (citing Zain I, 438 S.E.2d at 506).

Furthermore, "[t]he [high court] directed prosecutors to investigate Zain for violations of criminal law," which ultimately failed as a result of delay, a mistrial, and Zain's death in 2002. Id. ¶¶ 63-64 (citing Zain I, 438 S.E.2d at 508). One of the criminal counts against Zain stemmed from the testimony that he offered in Gardner's case. Id. ¶ 64. Additionally, a separate investigation revealed "that Zain did not have an appropriate or reliable academic background for the positions he held." Id. ¶ 65.

As earlier noted, the West Virginia Supreme Court of Appeals granted Gardner's Petition for a Writ of Habeas Corpus following the issuance of Zain I and remanded his case for further proceedings, including a full evidentiary hearing. Ballard, 172 F. Supp. 3d at 929, Compl. ¶ 71. Gardner notes that after an April 21, 1995 motion for an order for DNA testing, an "outside laboratory" found that the "bodily fluids at the crime scenes were consistent with Gardner's DNA." Compl.

¶ 72.  Despite alleged "previous findings that the donor of the fluid samples had a different blood type than Mr. Gardner," no explanation of the discrepancy nor of the origination of the sample was provided.  Id. (emphasis omitted).  At some point in 1995, Gardner claims that "then-[State Police] Public Safety Director Ted Smith presented newly discovered documentation to Mr. Gardner's attorney" comprised of "raw data sheets compiled by three other State Police serologists -- T.A. Smith, J.A. Bowles, and H.B. Myers -- that conclusively excluded Mr. Gardner based on his blood type alone."  Id. ¶ 52.

The Supreme Court of Appeals directed a full hearing on Gardner's case at least three times -- "March 1, 1995, July 2, 2002, and November 29, 2005" -- but none were ever conducted. Id. ¶ 73.  Gardner alleges that "part of this delay was due to acts and omissions of the County Prosecuting Attorney's Office." Id. ¶ 74.  As earlier noted, this court on November 12, 2013, excused Gardner's requirement to exhaust state remedies before pursuing federal habeas relief, Plumley, at *18, and on March 25, 2016, granted him federal habeas relief, vacated his convictions, and ordered the State to retry or release him within sixty days, Ballard, 172 F. Supp. 3d at 940-41.

15

The Prosecuting Attorney's Office "announced that Mr. Gardner would still face retrial for the charges . . . despite [allegedly] knowing that the available evidence was insufficient to support a conviction." Compl. ¶ 81. During pretrial proceedings in 2016, Gardner produced Dr. Theodore D. Kessis, Ph.D., "a serologist and DNA expert witness." Id. ¶ 82. "Dr. Kessis testified . . . that the evidence alleged by Zain to be inculpatory actually exculpated Mr. Gardner." Id. Further, Dr. Kessis testified "that an additional DNA test, performed in 1996 and purporting to include Mr. Gardner's characteristics among samples taken from both victims, was wholly unreliable and inaccurate." Id. The prosecution did not relent until September 7, 2016, five days before trial, when the Prosecuting Attorney's Office determined that it had insufficient evidence and dismissed all charges. Id. ¶¶ 82-84.

Gardner filed suit in this court on September 6, 2017, invoking the court's federal question and diversity jurisdiction. Id. ¶¶ 10-11. He advances five counts against the defendants for their various roles in his investigation, prosecution, conviction, incarceration, exoneration, and re-prosecution. Those counts are deprivation of rights under 42 U.S.C. § 1983 (Count I); malicious prosecution and abuse of process (Count II); unjust conviction and imprisonment under

common law (Count III); negligent hiring, retention, and
supervision (Count IV); and intentional infliction of emotional
distress (Count V).  He seeks, <u>inter alia</u>, at least $25 million
in damages, punitive damages, attorneys' fees, and interest.
<u>Id.</u> WHEREFORE Clause; <u>see also id.</u> ¶¶ 85-98.


   C. Motions to Dismiss


   Defendant Forbes seeks dismissal of all five counts.
He contends that (1) absolute prosecutorial immunity shields him
from each of Gardner's claims; (2) West Virginia common law
lacks claims for unjust conviction and imprisonment, Gardner's
Count III; and (3) the applicable statutes of limitations bar
Counts II through V.  <u>See generally</u> Forbes Mem. Supp.  In reply,
Forbes also raises for the first time the defense of qualified
immunity.  <u>See</u> Forbes Reply 7-8.

   Defendants the County Commission, the Prosecuting
Attorney's Office, Whitmyer, and Frail (together, "Kanawha
County Defendants"), in their joint motion to dismiss, seek
dismissal of all five counts as well.  Those defendants insist
that (1) absolute prosecutorial immunity shields them from each
of Gardner's claims; (2) Gardner fails to plead a "policy or
custom" sufficient to sustain his Count I § 1983 action against
a municipal entity; (3) the Gov't Tort Reform Act shields them

17

from liability for Counts II through V; (4) the applicable statutes of limitations bar Counts II through V; and (5) Gardner failed to join the necessary and indispensable parties of the State Police and the Division of Public Safety, warranting dismissal of all counts pursuant to Federal Rule of Civil Procedure 12(b)(7).  <u>See</u> Kanawha County Defs. Mem. Supp.

On February 12, 2018, the court ordered a stay of all discovery in this action due to the immunity defenses raised in the motions to dismiss.  <u>See</u> ECF #47.  Those motions are now ripe for disposition.

## II. Motion to Dismiss Standards

### A. Rule 12(b)(6)

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading "contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Correspondingly, Rule 12(b)(6) provides that a pleading may be dismissed for a "failure to state a claim upon which relief can be granted."

To survive a motion to dismiss, a pleading must recite "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007); see also Monroe v. City of Charlottesville, 579 F.3d 380, 386 (4th Cir. 2009) (quoting Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008)).  In other words, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555 (citation omitted); see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."); Andrew v. Clark, 561 F.3d 261, 266 (4th Cir. 2009) (quoting Twombly, 550 U.S. at 555).

"In resolving a motion pursuant to Rule 12(b)(6)[,] a district court cannot consider matters outside the pleadings without converting the motion into one for summary judgment." Occupy Columbia v. Haley, 738 F.3d 107, 116 (4th Cir. 2013) (citing Fed. R. Civ. P. 12(d)).  That rule is not, however, absolute.  As this court has explained,

> in reviewing a Rule 12(b)(6) motion, the court "may properly take judicial notice of matters of public record" without converting the motion to one for summary judgment. Philips v. Pitt Cty. Mem. Hosp., 572 F.3d 176, 180 (4th Cir. 2009) (citations omitted). The court may also consider documents attached to the

complaint, see Fed. R. Civ. P. 10(c), as well as those
attached to the motion to dismiss, "so long as they
are integral to the complaint and authentic."  Id.
(citing Blankenship v. Manchin, 471 F.3d 523, 526 n.1
(4th Cir. 2006)).

Corbett v. Duerring, 780 F. Supp. 2d 486, 492 (S.D. W. Va. 2011)

(Copenhaver, Jr., J.).  A matter of public record includes

"publicly-recorded papers from prior court proceedings."  Clark

v. BASF Salaried Emp.'s Pension Plan, 329 F. Supp. 2d 694, 697

(W.D.N.C. 2004) (quoting Happel v. Wal-Mart Stores, Inc., 286 F.

Supp. 2d 943, 945 (N.D. Ill. 2003)); see also 5B Charles Alan

Wright & Arthur R. Miller, Federal Practice and Procedure § 1357

(3d ed. 2018) ("Numerous cases . . . have allowed consideration

of matters incorporated by reference or integral to the claim,

items subject to judicial notice, matters of public record,

orders, items appearing in the record of the case, and exhibits

attached to the complaint whose authenticity is unquestioned;

these items may be considered by the district judge without

converting the motion into one for summary judgment.").

A district court's evaluation of a motion to dismiss

is underlain by two principles.  First, the court "must accept

as true all of the factual allegations contained in the

[pleading]."  Erickson v. Pardus, 551 U.S. 89, 94 (2007)

(citation omitted); see also Twombly, 550 U.S. at 555 ("Factual

allegations must be enough to raise a right to relief above the

speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." (citations omitted)).  In doing so, factual allegations should be distinguished from "mere conclusory statements," which are not to be regarded as true.  Iqbal, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").  Second, the court must "draw[] all reasonable factual inferences . . . in the [nonmovant's] favor."  Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999); see also Jenkins v. McKeithen, 395 U.S. 411, 421 (1969) ("[T]he complaint is to be liberally construed in favor of plaintiff.").

A defendant has the burden to establish an affirmative defense, such as the statute of limitations or immunity.  See Goodman v. Praxair, Inc., 494 F.3d 458, 464 (4th Cir. 2007) (en banc).

> It follows, therefore, that a motion to dismiss filed under Federal Rule of Procedure 12(b)(6), which tests the sufficiency of the complaint, generally cannot reach the merits of an affirmative defense . . . . But in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6). This principle only applies, however, if all facts necessary to the affirmative defense "clearly appear[] on the face of the complaint."  Richmond, Fredericksburg & Potomac R.R. v. Forst, 4 F.3d 244, 250 (4th Cir. 1993) (emphasis added).

Id.; see also Jones v. Bock, 549 U.S. 199, 215 (2007); Occupy
Columbia, 738 F.3d at 116.


    B. Rule 12(b)(7)


    Federal Rule of Civil Procedure 12(b)(7) permits a
court to dismiss an action for "failure to join a party under
Rule 19." Rule 19 governs "whether a party is 'necessary' and
'indispensable'" to an action. Home Buyers Warranty Corp. v.
Hanna, 750 F.3d 427, 433 (4th Cir. 2014) (citing Fed. R. Civ. P.
19).

    The moving party bears the burden of proof under Rule
12(b)(7). Am. Gen. Life & Accident Ins. v. Wood, 429 F.3d 83,
92 (4th Cir. 2005) (citing 7 Charles Alan Wright, Arthur R.
Miller & Mary Kay Kane, Federal Practice and Procedure § 1609
(3d ed. 2001)). Mirroring the review of a 12(b)(6) motion to
dismiss, the "court must accept all factual allegations in the
complaint as true and draw inferences in favor of the non-moving
party." 5C Federal Practice and Procedure, supra, § 1359 (3d
ed. 2018).

    "Dismissal of a case is a drastic remedy, . . . which
should be employed only sparingly." Teamsters Local Union No.
171 v. Keal Driveway Co., 173 F.3d 915, 918 (4th Cir. 1999).

Indeed, "[c]ourts are loath to dismiss cases based on nonjoinder of a party, so dismissal will be ordered only when the resulting defect cannot be remedied and prejudice or inefficiency will certainly result." Owens-Illinois, Inc. v. Meade, 186 F.3d 435, 441 (4th Cir. 1999). The court's decision must be pragmatic, with an eye to the particular circumstances of the instant case, including consideration of the allegedly necessary parties not presently joined. Id.; Teamsters Local Union No. 171, 173 F.3d at 918 (citing Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102, 112 n.10 (1968), and Schlumberger Indus., Inc. v. Nat'l Sur. Corp., 36 F.3d 1274, 1285-86 (4th Cir. 1994)).

### III. Failure to Join Necessary and Indispensable Parties

Kanawha County Defendants contend that the complaint should be dismissed pursuant to Rule 12(b)(7) for Gardner's failure to join the State of West Virginia, the State Police, the West Virginia Division of Public Safety, and the Estate of Fred Zain. Kanawha County Defs. Mem. Supp. 27. Federal Rule of Civil Procedure 19, which governs the required joinder of parties, sets forth a two-step inquiry: "(1) whether the party is 'necessary' to the action under Rule 19(a); and (2) whether the party is 'indispensable' under Rule 19(b)." Am. Gen. Life &

Accident Ins. Co., 429 F.3d at 92 (citing Nat'l Union Fire Ins.
Co. of Pittsburgh v. Rite Aid of S. Car., Inc., 210 F.3d 246,
249 (4th Cir. 2000)).  "'Dismissal of a case is a drastic
remedy, however, which should be employed only sparingly.'  In
determining whether to dismiss a complaint, a court must proceed
pragmatically, 'examin[ing] the facts of the particular
controversy to determine the potential for prejudice to all
parties, including those not before it.'"  Nat'l Union Fire Ins.
Co. at 250 (quoting Teamsters Local Union No. 171 v. Keal
Driveaway Co., 173 F.3d 915, 918 (4th Cir. 1999)).

        Kanawha County Defendants note that Gardner is
pursuing a parallel action in the Circuit Court of Kanawha
County, captioned Gardner v. West Virginia, No. 17-C-1267.
Kanawha County Defs. Mem. Supp. 29.  They insist that the
parallel action makes the State of West Virginia, the State
Police, the West Virginia Division of Public Safety, and the
Estate of Fred Zain necessary and indispensable for three
reasons.  First, the existence of separate actions runs the risk
of inconsistent judgments.  Second, the defendants here could
face more than their actual share of liability, if any.  And
third, litigating two cases could contribute to what will
already be complicated discovery.

None of those arguments demonstrate the necessity of the non-joined parties.  It makes obvious sense that parties who had different roles in the alleged underlying conduct could face different judgments, whether in the same action or not.

Regarding shares of liability, "[i]t has long been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit. . . .  The Advisory Committee Notes to Rule 19(a) explicitly state that 'a tortfeasor with the usual "joint-and-several" liability is merely a permissive party to an action against another with like liability.'"  Temple v. Synthes Corp., 498 U.S. 5, 7 (1990) (internal citations omitted).

Last, although the defendants here have the statutory right to litigate this action in federal court, see 28 U.S.C. § 1441, the State of West Virginia, the State Police, and the West Virginia Division of Public Safety have Eleventh Amendment immunity against suit in federal court, Seminole Tribe v. Florida, 517 U.S. 44, 54 (1996).  Further complicating matters, Eleventh Amendment immunity yields to Gardner's claim under 42 U.S.C. § 1983.  Fitzpatrick v. Bitzer, 427 U.S. 445, 456 (1976). Thus, it appears unavoidable that Gardner will be forced to pursue his claims in separate courts.

In sum, the absence of the State of West Virginia, the State Police, the West Virginia Division of Public Safety, and the Estate of Fred Zain does not bar the resolution of this action.  Continuing without their presence would not impair their ability to protect their own interests and would not be prejudicial to the existing parties' ability to do the same.  It is also notable that likely nothing remains of the Estate of Fred Zain because Zain died in 2002, greatly militating against the Estate's indispensability.  Accordingly, Kanawha County Defendants' Rule 12(b)(7) motion is denied.

### IV. Action for Unjust Conviction and Imprisonment

Gardner's Count III is titled "Unjust Conviction and Imprisonment Under Common Law."  Compl. Count III.  Forbes argues that no such common-law claim is recognized by either the Supreme Court of Appeals of West Virginia or the federal courts.  Forbes Mem. Supp 8; ECF #27.  Forbes claims that, in violation of the federal rules, "[Gardner's] ambiguity has forced Mr. Forbes . . . to guess what cause(s) of action [Gardner]" advances in Count III.  Forbes Reply 8.

26

Gardner responds that his Count III claim for "unjust imprisonment" is fairly read as one for "false imprisonment" under West Virginia common law.[2]  Gardner Opp'n to Forbes 8-9. Gardner contends that Count III provides "adequate and fair notice of the claims asserted against" the defendants.  Id. 9.

In West Virginia, "the gist of the action for false imprisonment is illegal detention of a person without lawful process or by an unlawful execution of such process." Riffe v. Armstrong, 197 W. Va. 626, 640 (1996), overruled on other grounds by Syl. Pt. 4, Moats v. Preston Cty. Comm'n, 206 W. Va. 8 (1999).  As Gardner notes, the complaint -- paragraphs 118 to 127 under Count III in particular -- alleges that Gardner's conviction and imprisonment were based upon the defendants' alleged knowing presentation of false evidence.  See Gardner Opp'n to Forbes 8-9.  Although Count III is not titled with the word "false," "unjust" has a parallel connotation.

---

[2] Gardner also contends that the elements parallel "the more recently codified statutory claim for unjust arrest and imprisonment and unjust conviction and imprisonment[,]" under W. Va. Code § 14-2-13a.  Finding that Gardner adequately pled a false imprisonment claim, and noting that the complaint asserts that Count III is brought "Under Common Law[,]" the court does not address this contention.

Broadly speaking, Gardner alleges the "gist" of a false imprisonment claim.  This result is in keeping with the maxim that a plaintiff need provide only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2); see also In re Baycol Prods. Litig., 732 F.3d 869, 875 n.4 (8th Cir. 2013) ("We are not concerned, however, with the labels a party attaches to a claim. Instead, we focus on the substance of the underlying factual allegations." (citing inter alia, Twombly, 550 U.S. at 555)). Thus, the defendants at least have -- without passing on the sufficiency of the facts alleged -- fair notice that they are accused of falsely imprisoning Gardner.

Even so, Forbes likens the complaint to a so-called "shotgun complaint," which can be described as follows:

> A complaint is a shotgun complaint where "it is virtually impossible to know which allegations of fact are intended to support which claim(s) for relief." Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll., 77 F.3d 364, 366 (11th Cir. 1996). . . . "[T]hey fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." Weiland v. Palm Beach Cty. Sheriff's Office, 792 F.3d 1313, 1323 (11th Cir. 2015).

Brazil v. Janssen Research & Dev. LLC, 249 F. Supp. 3d 1321, 1336 (N.D. Ga. 2016).  Such is not the case here.  Count III, although it states "unjust" rather than "false," is succinctly

comprised of ten paragraphs that plainly detail the gist of a false imprisonment action: Gardner was imprisoned as a result of the allegedly unlawful actions of the defendants.  Accordingly, the defendants had adequate notice of Gardner's false imprisonment claim, and Forbes's argument is without merit.


### V. Absolute Prosecutorial Immunity


Forbes and Kanawha County Defendants argue that absolute prosecutorial immunity shields Forbes, Whitmyer, and Frail (together, the "prosecutors") from Gardner's claims. Forbes Mem. Supp. 3; Kanawha County Defs. Mem. Supp. 5.[3]  At West Virginia common law under 42 U.S.C. § 1983, prosecutors enjoy absolute immunity from civil liability for actions taken during the execution of their prosecutorial duties.  See Mooney v. Frazier, 225 W. Va. 358, 370 n.12 (2010) (quoting Franklin D. Cleckley, et al., Litigation Handbook on West Virginia Rules of Civil Procedure § 8(c), at 213 (3d ed. 2008)); Imbler v.

---

[3] The court notes that the non-prosecutor defendant -- the County Commission -- cannot avail itself of prosecutorial immunity. See Ky. v. Graham, 473 U.S. 159, 166-67 (1985).  Nor can the Prosecuting Attorney in its official capacity.  Id.  While the Kanawha County Defendants speak as a single unit when invoking prosecutorial immunity, the court assumes that this was done merely as a matter of convenience.

_Pachtman_, 424 U.S. 409, 427 (1976).[4]  But that immunity is not limitless.  "[I]n determining immunity, we examine 'the nature of the function performed, not the identity of the actor who performed it.'"  _Kalina v. Fletcher_, 522 U.S. 118, 127 (1997) (quoting _Forrester v. White_, 484 U.S. 219, 229, (1988)). Specifically, "absolute immunity may not apply when a prosecutor is not acting as 'an officer of the court,' but is instead engaged in other tasks, say, investigative or administrative tasks."  _Van de Kamp v. Goldstein_, 555 U.S. 335, 342 (2009) (quoting _Imbler_, 424 U.S. at 431 n.33).  Phrased differently, the prosecutorial action must be "intimately associated with the judicial phase of the criminal process" for absolute immunity to apply.  _Imbler_, 424 U.S. at 430.  Otherwise, qualified immunity applies.  _Buckley v. Fitzsimmons_, 509 U.S. 259, 270, 273-74 (1993)).

      Our court of appeals recently framed the absolute immunity inquiry as follows:

> To determine whether a particular act is "intimately associated with the judicial phase," _Imbler_, 424 U.S. at 430, we employ a functional approach. . . .  The

---

[4] _Mooney_ appears to be the only decision by the West Virginia high court that addresses prosecutorial immunity.  It does so in a manner consistent with the common-law traditions described by the United States Supreme Court and, indeed, references two foundational Supreme Court decisions.  225 W. Va. at 370 n.12. Thus, for purposes of this discussion, the court will apply to Gardner's state-law claims the prosecutorial immunity principles described by the United States Supreme Court.

> official claiming absolute immunity "bears the burden of showing that such immunity is justified for [each] function in question." Burns v. Reed, 500 U.S. 478, 486 (1991).
>
> In applying this functional approach, the Supreme Court has distinguished between advocative functions and investigative or administrative functions, holding that the former enjoy absolute immunity but the latter do not. See Kalina, 522 U.S. at 125-26. A prosecutor acts as an advocate when she professionally evaluates evidence assembled by the police, Buckley, 509 U.S. at 273, decides to seek an arrest warrant, Kalina, 522 U.S. at 130, prepares and files charging documents, id., participates in a probable cause hearing, Burns, 500 U.S. at 492, and presents evidence at trial, Imbler, 424 U.S. at 431. In contrast, a prosecutor does not act as an advocate, but rather in an investigative or administrative capacity, when she gives legal advice to police during an investigation, Burns, 500 U.S. at 493, investigates a case before a probable cause determination, Buckley, 509 U.S. at 274, and personally attests to the truth of averments in a statement of probable cause, Kalina, 522 U.S. at 129.

Nero v. Mosby, 890 F.3d 106, 118 (4th Cir. 2018) (alteration in original). An immunity defense should be addressed early in a case because "[t]he very heart of the immunity defense is . . . spar[ing] the defendant from having to go forward with an inquiry into the merits." Hutchinson v. City of Huntington, 198 W. Va. 139, 148 (1996); see also Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).

The fingerprint evidence and the use of Zain at Gardner's trial are the foundation for Gardner's claims. Specifically, Gardner alleges that the prosecutors knowingly

presented Zain's unreliable or false testimony, see Giglio v. United States, 405 U.S. 150 (1972), and failed to disclose exculpatory evidence, see Brady v. Maryland, 373 U.S. 83 (1963); "approv[ed] Zain as a contractor and enroll[ed] him as a contractor and vendor" for use in Gardner's case as well as others, despite the fact that the Prosecutors knew or should have known that Zain was unreliable, unqualified, and fraudulent; knowingly lacked probable cause to prosecute and to attempt to re-try Gardner but did so anyway; imprisoned Gardner based on false and unreliable evidence; failed to adequately vet Zain "[p]rior to approving Zain as a contractor and vendor" and while retaining and supervising Zain; and acted outrageously toward Gardner by relying on false and unreliable evidence.  See Compl. ¶¶ 100-02, 104, 106, 112-13; 119-20; 131-37; 145-46.

Just as the prosecutors contend, each of these alleged actions fall within their function as advocates for the state. See Forbes Mem. Supp. 4-8; Kanawha County Defs. Mem. Supp. 7-9.

Indeed, the United States Supreme Court has long held that prosecutors are absolutely immune from civil liability for eliciting false testimony, Burns, 500 U.S. at 489-90; malicious prosecution, see Imbler, 424 U.S. at 422; decisions as to "which witnesses to call[] and what other evidence to present," id. at 431 n.33; failing to identify problems concerning witness

credibility and share that information, <u>Van de Kamp</u>, 555 U.S. 343-44; failing to identify exculpatory evidence and share that evidence, <u>Imbler</u>, 424 U.S. at 431 n.34; and "the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made," <u>Buckley</u>, 509 U.S. at 273.

Gardner attempts to frame his claims as arising from the prosecutors' administrative functions. The prosecutors, according to Gardner, are liable not for their "employment and retention of Zain in connection with his selection and use at [Gardner's] trial," but "for their administrative activities leading up to [Gardner's] prosecution -- namely their acts and omissions in selecting, approving, vetting and training Fred Zain as an approved contractor -- who they then considered an available witness for the prosecutions of [Gardner] and numerous other defendants." <u>E.g.</u> Gardner Opp'n to Forbes 5-6. Gardner argues that the Prosecutors also "approved [Zain] for payments . . . requested via payment orders." <u>E.g.</u> <u>id.</u> 6 (quotation marks omitted). Further, Gardner points to his allegation that, in November 1992, two years after his 1990 sentencing, Forbes used a letter from the State Police superintendent dubiously clearing Zain of misconduct as pretext to decline following up on

information indicating that Zain had presented false evidence in criminal cases, including Gardner's.  E.g. id. 7.

However, as Forbes notes, the Supreme Court instructs that "a prosecutor performing an ostensibly 'administrative' task still enjoys absolute immunity if the act is done in service of an advocacy function[.]"  Safar v. Tingle, 859 F.3d 241, 249 (4th Cir. 2017) (discussing Van de Kamp, 555 U.S. at 349); Forbes Reply 3.  Such quasi-administrative tasks are typified where "an individual prosecutor's error in the plaintiff's specific criminal trial constitutes an essential element of the plaintiff's claim," or the targeted tasks "necessarily require legal knowledge and the exercise of related discretion" or are "directly connected with the prosecutor's basic trial advocacy duties."  Van de Kamp, 555 U.S. at 344, 346.  On the other hand, activities such as "workplace hiring, payroll administration, the maintenance of physical facilities, and the like" or an action for "unlawful discrimination in hiring employees" bear the hallmarks of truly administrative tasks.  Id.

The use of Zain "as an approved contractor," even if it could be styled as administrative, is nevertheless "intimately associated with the judicial phase of the criminal process."  Imbler, 424 U.S. at 430.  The crux of Gardner's

34

claims remains the use of Zain at his trial.[5]  Moreover, the
selection of which witnesses to use at trial requires the
exercise of legal discretion and bears a clear connection to a
prosecutor's basic trial advocacy duties.  This quasi-
administrative task invokes the longstanding principle that a
prosecutor's decision of "which witnesses to call[] and what
other evidence to present" at trial is an advocative function
protected by absolute immunity.  Imbler, 424 U.S. at 431 n.33.

     Gardner's assertion that payments made to Zain
constitute administrative events separate from his actual use as
a witness is similarly without merit.  Otherwise, an anomaly
would exist where a prosecutor would be liable when a witness is
paid for his testimony, but not if the witness testifies for
free.  "Most important, the ease with which a plaintiff could
restyle a complaint charging a trial failure so that it becomes
a complaint charging [one for administrative failure] would

---

[5] Insofar as Gardner complains of the prosecutors' general habit
of using Zain -- wholly detached from his wrongful conviction --
Gardner surely lacks standing.  See Arizonans for Official
English v. Arizona, 520 U.S. 43, 64 (1997) ("An interest shared
generally with the public at large in the proper application of
the Constitution and laws will not do."); Allen v. Wright, 468
U.S. 737, 754 (1984) ("[A]n asserted right to have the
Government act in accordance with law is not sufficient,
standing alone, to confer jurisdiction on a federal court."),
abrogated on other grounds by Lexmark Intern., Inc. v. Static
Control Components, Inc., 134 S. Ct. 1377, 1387-88 (2014).

eviscerate" absolute prosecutorial immunity.  Van de Kamp, 555
U.S. at 347.

Although not discussed by the parties, the allegation
involving Forbes and the November 1992 letter poses the issue of
prosecutorial immunity in the post-conviction context.  It, too,
is insufficient to avoid Forbes's absolute prosecutorial
immunity.  Courts, including the Fourth Circuit, have generally
held that a prosecutor retains absolute immunity post-conviction
so long as the prosecutor remains personally involved in the
case.  The prosecutor remains an advocate for the state and
therefore "implicate[s] the judicial process."  See Carter v.
Burch, 34 F.3d 257, 263 (4th Cir. 1994), cert. denied, 513 U.S.
1150 (1995); see also Warney v. Monroe County, 587 F.3d 113,
121-23 (2d Cir. 2009); Yarris v. County of Del., 465 F.3d 129,
137 (3d Cir. 2006); Spurlock v. Thompson, 330 F.3d 791, 799 (6th
Cir. 2003), reh'g denied, 2004 U.S. App. LEXIS 21698 (2004);
Houston v. Partee, 978 F.2d 362, 366 (7th Cir. 1992), cert.
denied, 507 U.S. 1005 (1993).

Here, while it does not appear that Forbes was working
on Gardner's case in any advocative capacity in November 1992,
the letter did not contain any new, exculpatory information.  In
fact, the letter evidently cast Zain in a positive light,
stating that "there were no further problems with Zain Evidence

or related defendants." Compl. ¶ 35. It thus did not constitute exculpatory evidence, and Forbes's continuing constitutional duty to disclose such evidence was not triggered.

By invoking the 1992 letter event, Gardner attempts to circumvent Forbes's absolute immunity by grasping at an only tangentially related administrative task. Gardner's true complaint is the failure to disclose any exculpatory evidence concerning Zain at the criminal trial. Forbes' later receipt of a tangentially related piece of information about Zain does not constitute an administrative event distinct from his previous failure to disclose at trial, which is shielded by absolute immunity. Rather, such a claim is precisely the type of legal craftmanship that the United States Supreme Court cautions "would eviscerate Imbler" and the doctrine of prosecutorial immunity. Van de Kamp, 555 U.S. at 347.

The court recognizes the strikingly tragic injustice that Zain inflicted upon Gardner and many others. His actions -- as well as the alleged knowing or willfully blind actions of the prosecutors -- "stain our judicial system and mock the ideal of justice under law." Zain I, 438 S.E.2d at 508. The fact that Gardner is left without a civil redress against the alleged abettors of the genuine wrong against him is hardly ideal. But the Supreme Court has measured this against the alternative:

"[I]t has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation." Imbler, 424 U.S. at 428 (quoting Gregoire v. Biddle, 177 F.2d 579, 581 (2d Cir. 1949), cert. denied, 339 U.S. 949 (1950) (Learned Hand, J.)).

Prosecutorial misconduct is not, however, devoid of consequence or deterrence.  The Fourth Circuit has summarized that

> [p]rosecutors remain subject to criminal sanction for willful acts of abuse.  Id. at 429.  And "[t]he organized bar's development and enforcement of professional standards for prosecutors" provides a "well-developed and pervasive mechanism" for controlling official malpractice.  Malley v. Briggs, 475 U.S. 335, 343 n.5 (1986); accord Imbler, 424 U.S. at 429 ("[A] prosecutor stands perhaps unique, among officials whose acts could deprive persons of constitutional rights, in his amenability to professional discipline by an association of his peers.").  Protections such as these "obviate the need for damages actions to prevent unjust results." Mitchell v. Forsyth, 472 U.S. 511 (1985).

Safar, 859 F.3d at 250.

Accordingly, the prosecutors (Forbes, Whitmyer, and Frail) are entitled to the defense of and shielded by absolute prosecutorial immunity from each of Gardner's claims.[6]

---

[6] Having concluded that Forbes' alleged actions fall within his advocative function, his assertion that he is also entitled to

VI. Local Government Immunity

Kanawha County Defendants argue that they are immune from Counts II through V pursuant to the West Virginia Governmental Tort Claims and Insurance Reform Act of 1986, W. Va. Code §§ 29-12A-1 et seq.  Kanawha County Defs. Mem. Supp. 12.[7]  Like absolute prosecutorial immunity, local government immunity should be addressed at an early stage in a case.  See City of Huntington, 198 W. Va. at 148.  "The issue of . . . immunity under the [Gov't Tort Reform Act] from liability . . . is purely a question of law and is ripe for summary disposition

---

qualified immunity, Forbes Reply 7-8, is disregarded because that defense does not apply.  See Buckley, 509 U.S. at 273.

[7] The Gov't Tort Reform Act does not provide immunity against Gardner's claim for deprivation of rights under § 1983 (Count I) because the Act excludes from its immunity provisions all "[c]ivil claims based upon alleged violations of the constitution or statutes of the United States."  W. Va. Code Ann. § 29-12A-18(e).

Kanawha County Defendants purport that the Prosecuting Attorney is immune under the Gov't Tort Reform Act as a local government employee.  Kanawha County Defs. Mem. Supp. 15.  However, the Prosecuting Attorney is being sued in its official capacity; its local government immunity analysis will therefore proceed along the same lines as the other "political subdivisions," as discussed below.  See W. Va. Code Ann. § 29-12A-3; see also Graham, 473 U.S. at 166-67 (brief description and comparison of federal individual- and official-capacity immunities).

Last, Gardner and Kanawha County Defendants agree that the Gov't Tort Reform Act precludes Gardner's claim for punitive damages under his state-law claims against the defendants.  W. Va. Code Ann. § 29-12A-7(a).

. . . through a motion to dismiss." <u>State ex rel. Town of Pratt</u> <u>v. Stucky</u>, 229 W. Va. 700, 707 (2012).  The local government immunity analysis proceeds with "the general rule of construction [that] governmental tort legislation cases favor[] liability, not immunity."  <u>State ex rel. Corp. of Charles Town</u> <u>v. Sanders</u>, 224 W. Va. 630, 633 (2009) (citing Syl. Pt. 2, <u>Marlin v. Bill Rich Constr., Inc.</u>, 198 W. Va. 635 (1996)).

The West Virginia Legislature enacted the Gov't Tort Reform Act "to limit liability of . . . and provide immunity to political subdivisions."  W. Va. Code Ann. § 29-12A-1.  The County Commission and the Prosecuting Attorney's Office are plainly "political subdivisions" under the Gov't Tort Reform Act.  <u>See id.</u> § 29-12A-3(c).[8]  The West Virginia Supreme Court of Appeals summarized the interplay of the Act's immunity for political subdivisions as follows:

> West Virginia Code § 29-12A-4(b) establishes the
> baseline principle that a political subdivision is not
> liable for "governmental or proprietary function[s]"
> except as set forth in subsection (c).  Subsection (c)
> sets forth five general categories of negligence-based
> acts or functions for which a political subdivision is
> not entitled to immunity and may be held liable

---

[8] Under the Act, a "political subdivision" is, in relevant part, "any county commission, municipality and county board of education; any separate corporation or instrumentality established by one or more counties or municipalities, as permitted by law; any instrumentality supported in most part by municipalities; [and] any public body charged by law with the performance of a government function and whose jurisdiction is coextensive with one or more counties, cities or towns."  <u>Id.</u>

> including specifically, "negligent performance of acts
> by [] employees while acting within the scope of
> employment."  W. Va. Code § 29-12A-4(c)(2).
> Irrespective of whether a case falls into one of the
> five categories set forth in subsection (c), stripping
> the political subdivision of its general immunity, the
> Gov't Tort Reform Act goes on to enumerate seventeen
> categories of specific functions for which a political
> subdivision is nonetheless still immune.  W. Va. Code
> § 29-12A-5(a)(1)-(17).

Bowden v. Monroe Cty. Comm'n, 232 W. Va. 47, 51 (2013).

Importantly, the immunity of political subdivisions yields only to "negligence-based acts or functions."  Id.; see W. Va. Code Ann. § 29-12A-4(c); see also Kelley v. City of Williamson, 221 W. Va. 506, 513 (2007) (discussing Mallamo v. Town of Rivesville, 197 W. Va. 616 (1996)) (per curiam).  In other words, political subdivisions cannot be held liable for the intentional torts of their employees.  See Byndon v. Pugh, 350 F. Supp. 3d 495, 511 (N.D.W. Va. 2018) ("this intentional tort claim against the City should be dismissed since the law does not allow political subdivisions to be held liable for 'intentional malfeasance' on the part of their employees."); Webb v. Raleigh Cty. Sheriff's Dep't, 761 F. Supp. 2d 378, 394 (S.D.W. Va. 2010) ("To the extent the Raleigh County Commission may only be held liable for the negligent acts of its employees, the intentional state torts . . . are dismissed as to the Raleigh County Commission."); and Zirkle v. Elkins Rd. Pub. Serv. Dist., 221 W. Va. 409, 414 (2007) (per curiam) ("claims of

41

intentional and malicious acts are included in the general grant
of immunity in W.Va.Code, 29–12A–4(b)(1). Only claims of
negligence specified in W.Va.Code, 29–12A–4(c) can survive
immunity from liability under the general grant of immunity in
W.Va.Code, 29–12A–4(b)(1).").

   With the exception of Count IV, none of Gardner's
claims are negligence-based: malicious prosecution requires
malice, Syl. Pts. 1-2, Norfolk S. Ry. Co. v. Higginbotham, 228
W. Va. 522 (2011); abuse of process requires willfulness or
malice, Syl. Pt. 3, Williamson v. Harden, 214 W. Va. 77 (2003)
(per curiam); false imprisonment requires intent, Erie Ins.
Prop. & Cas. Co. v. Edmond, 785 F. Supp. 2d 561, 573 (N.D. W.
Va. 2011); and IIED requires intent, Syl. Pt. 3, Travis, 202 W.
Va. 369.

   So it is that the Gov't Tort Reform Act grants
immunity to the County Commission and the Prosecuting Attorney
on Counts II, III, and V.  See Holsten v. Massey, 200 W. Va.
775, 788 (1997) (stating that "willful" and "reckless" connotes
intentional actions); Peters v. Rivers Edge Mining, Inc., 224 W.
Va. 160, 190 (2009) (stating that "malice" is founded in "the
general disregard of the rights of others, rather than an intent
to injure" another).

The only claim left for analysis under the Gov't Tort Reform Act is the Count IV negligent hiring, retention and supervision ("NHRS") claim against the County Commission and the Prosecuting Attorney, which predictably requires a showing of negligence, see King, 299 W. Va. at 140, and is therefore subject to liability under W. Va. Code § 29-12A-4(c)(2).[9]

Accordingly, the Gov't Tort Reform Act shields the County Commission and the Prosecuting Attorney from Counts II, III, and V, but not IV.

## VII. Statutes of Limitations

At this point, the only surviving claims are Counts I (§ 1983) and IV (NHRS) against the County Commission and the Prosecuting Attorney. Those defendants argue that Count IV is time-barred. See Kanawha County Defs. Mem. Supp. 24-25. A federal court sitting in diversity must apply the "substantive" law of its forum state. Gasperini v. Ctr. for Humanities, 518 U.S. 415, 426-27 (1996) (citing and quoting Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)). A state's statute of

---

[9] Section 29-12A-4(c)(2) also requires that the negligent actions be performed "while acting within the scope of employment." W. Va. Code Ann. § 29-12A-4(c)(2). Again, there is no dispute that any hiring, retention, or supervision decisions here would have been within the scope of employment.

limitations for a state-law claim is substantive law.  Walker v. Armco Steel Corp., 446 U.S. 740, 745 (1980); Guaranty Trust Co. v. York, 326 U.S. 99, 110-11 (1945); Bonham v. Weinraub, 431 F. App'x 615, 616 (4th Cir. 2011).

In West Virginia, "[a] five-step analysis should be applied to determine whether a cause of action is time-barred." Syl. Pt. 5, Dunn v. Rockwell, 225 W. Va. 43 (2009).  The court should: first, "identify the applicable statute of limitation for each cause of action"; second, "identify when the requisite elements of the cause of action occurred"; third, "[apply] the discovery rule . . . to determine when the statute of limitation began to run . . . , as set forth in Syllabus Point 4 of Gaither v. City Hospital, Inc., 199 W. Va. 706, 487 S.E.2d 901 (1997)"; fourth, "if the plaintiff is not entitled to the benefit of the discovery rule, then determine whether the defendant fraudulently concealed facts that prevented the plaintiff from discovering or pursuing the cause of action[,]" in which case "the statute of limitation is tolled"; and fifth, "determine if the statute of limitation period was arrested by some other tolling doctrine."  Syl. Pt. 5, Dunn, 225 W. Va. 43.  The first step of the Dunn framework is a question of law, while the remaining four are questions of fact.  Id.

The parties agree that a two-year limitations period applies to a NHRS cause of action.  Kanawha County Defs. Mem. Supp. 24; e.g. Gardner Opp'n to Forbes 12.  In doing so, they reference two decisions of the Supreme Court of Appeals, Casto v. Dupuy, 204 W. Va. 619, 623 (1999) (per curiam), and Pizzuto v. Randolph, No. 12-1298, 2013 W. Va. LEXIS 1028, at *5 n.3 (W. Va. Oct. 4, 2013) (memorandum decision).  Those decisions express mere tacit approval, at best, of the two-year limitations period.  Otherwise, search of the case law reveals that the Supreme Court of Appeals has not squarely addressed the limitations period for NHRS, even in dicta.

The court nonetheless concludes that the two-year limitations period for typical negligence actions governs a claim of NHRS.  See Trafalgar House Constr. v. ZMM, Inc., 211 W. Va. 578, 583 (2002) (deciding that a claim for negligence is governed by a two-year statute of limitations).

Based on when the tort would have been completed -- upon Gardner's conviction -- the NHRS claim would have accrued in 1990.  See Merrill v. W. Va. Dep't of Health & Hum. Res., 219 W. Va. 151, 156 (2006) (quoting Syl. Pt. 1, Cart v. Marcum, 188 W. Va. 241 (1992), overruled on other grounds, Syl. Pt. 1, Dunn, 225 W. Va. 43) (stating that "a cause of action accrues . . . when a tort occurs").

45

Gardner argues, however, that his NHRS claim benefits
from the discovery rule, which tolls the statute of limitations
until such time when the plaintiff knows, or by the exercise of
reasonable diligence, should know: "(1) that the plaintiff has
been injured, (2) the identity of the entity who owed the
plaintiff a duty to act with due care, and who may have engaged
in conduct that breached that duty, and (3) that the conduct of
that entity has a causal relation to the injury." Syl. Pt. 4,
Gaither, 199 W. Va. 706. The discovery rule "is an objective
test. The plaintiff is charged with knowledge of the factual,
rather than the legal, basis for the action." Dunn, 225 W. Va.
at 53. Because Gardner had knowledge of potential negligence by
the County Commission and the Prosecuting Attorney in hiring,
retaining, and supervising Zain with the issuance of Zain I, 190
W. Va. at 336, in 1993, the discovery rule does not save his
claim.

Gardner also argues that the defendants have
fraudulently concealed their misconduct, and that such
concealment continues to this day. Even if Gardner's threadbare
arguments had substance, fraudulent concealment tolls the
statute of limitations only "[w]hen[] . . . [a] defendant['s]
fraudulent[] conceal[ment of] facts . . . prevented the
plaintiff from discovering or pursuing the potential cause of

46

action." Syl. Pt. 5, Dunn, 225 W. Va. 43.  Because Gardner had
knowledge of the facts underlying a possible NHRS cause of
action when he filed his habeas petition in 1993, fraudulent
concealment cannot save his claim.

Additionally, Gardner claims that he "has alleged new
liability arising from [the County Commission and the
Prosecuting Attorney's] efforts to re-prosecute [Gardner] based
on insufficient evidence."  Gardner Opp'n to Kanawha County
Defs. 14.  The complaint makes plain, however, that Count IV
against those defendants is entirely based upon their use of
Zain as an expert in Gardner's trial.  Neither the discovery
rule nor fraudulent concealment bring Gardner's claims within
the statute of limitations.

For the same reasons that these arguments fail, so,
too, do Gardner's arguments that his NHRS claim is saved by at
least one of three tolling doctrines: equitable estoppel,
equitable tolling, and statutory tolling.  Gardner Opp'n to
Kanawha County Defs. 15.

As for his equitable estoppel argument, Gardner points
to Forbes's alleged actions with regards to the November 1992
letter from the State Police superintendent, Compl. ¶ 35, and
baldly contends that additional information regarding the
defendants' misconduct continues to be unsealed by a state

47

court.  <u>See</u> Gardner Opp'n to Kanawha County Defs. 15.  Inasmuch
as this alleged misconduct occurred in 1992, the discovery rule
already delays the accrual of Gardner's NHRS claim against the
County Commission and the Prosecuting Attorney until 1993, when
<u>Zain I</u> was issued and Gardner filed his first habeas petition.
Gardner fails to otherwise to show that he detrimentally relied
upon any affirmative act by any defendant; equitable estoppel
thus does not toll the limitations period of Gardner's NHRS
claim.

     The same is true for his equitable tolling argument,
which relies on the same allegation regarding Forbes's 1992
receipt of the letter.  Gardner Opp'n to Kanawha County Defs.
15; <u>see</u> Compl. ¶ 35.[10]

---

[10] "As a general matter, equitable tolling pauses the running of
. . . a statute of limitations when a litigant has pursued his
rights diligently but some extraordinary circumstance prevents
him from bringing a timely action."  <u>Lozano v. Montoya Alvarez</u>,
134 S. Ct. 1224, 1232-33 (2014).  The notes that Gardner's
incarceration, although the most striking circumstance at the
time of Gardner's causes of action, was not raised by Gardner
but would nonetheless fail to save his claim.  "[T]here is no
tolling provision in [West Virginia's] statute of limitations"
regarding incarceration, and "[i]t is generally held [that]
absent specific [statutory] provisions to the contrary . . . ,
there is no exemption because of imprisonment."  <u>Craigo v.
Marshall</u>, 175 W. Va. 72, 75 (1985) (citing 51 Am. Jur. 2d
Limitation of Actions, §§ 192-93 (1970), and Annot., 77 A.L.R.3d
735 (1977)); <u>cf.</u> <u>McCray v. City of New York</u>, No. 03 Civ. 9685
(DAB), 2007 U.S. Dist. LEXIS 90875, at *53-57 (S.D.N.Y. Dec. 11,
2007) (denying equitable tolling of the § 1983 false arrest and
false imprisonment claims of plaintiffs whose convictions had
been vacated after approximately twenty years).

As for statutory tolling, described in W. Va. Code § 55-2-17, that section provides pertinently as follows:

> Where any such right as is mentioned in this article shall accrue against a person . . . , if such person shall . . . conceal[] himself, or by any other indirect ways or means, obstruct the prosecution of such right, . . . the time that such obstruction may have continued shall not be computed as any part of the time within which the said right might or ought to have been prosecuted.

W. Va. Code. Ann. § 55-2-17.  This provision appears to mirror the doctrine of fraudulent concealment, which has already been discussed.  Statutory tolling thus does not save Gardner's time-barred claims.

Accordingly, Count IV against the County Commission and the Prosecuting Attorney is time-barred by the applicable limitations period.

## VIII. Failure to State a Claim

After resolution of the affirmative defenses asserted on the motions to dismiss, Gardner's only surviving claim is his § 1983 claim (Count I) against the County Commission and the Prosecuting Attorney.  Gardner alleges that his constitutional rights were violated by the presentation of Zain's false

testimony, see Giglio, 405 U.S. 150;[11] the failure to disclose

exculpatory information regarding Zain, see Brady, 373 U.S. 83;

and the creation of "an inaccurate and unreliable, and possibly

even faked and fraudulent, fingerprint record."  Compl. ¶¶ 100,

102, 107.  Kanawha County Defendants contend that Gardner has

failed to state a plausible § 1983 claim.  Kanawha County Defs.

Mem. Supp. 9.

        Before examining the merits of the 12(b)(6) motion to

dismiss Gardner's § 1983 claim, the court briefly discusses the

interplay between the remaining defendants and their liability

in a § 1983 suit.  In Brandon v. Holt, the Supreme Court

explained "that a judgment against a public servant 'in his

official capacity' imposes liability on the entity that he

---

[11] Gardner cites Giglio for the proposition, as stated by him,
that "[a] due process violation occurs when the prosecution
convicts a defendant based upon false evidence, regardless of
whether the prosecutor is aware of its falsity."  Compl. ¶ 100.
The Supreme Court has not yet so held, although it has decided
that the knowing use or allowance of false testimony violates
due process, see Giglio, 405 U.S. at 153-54.  But some circuits
have agreed with Gardner's position: see Maxwell v. Roe, 628
F.3d 486, 506-07 (9th Cir. 2010), Ortega v. Duncan, 333 F.3d
102, 108 (2d Cir. 2003); but see Pierre v. Vannoy, 891 F.3d 224,
227-29 (5th Cir. 2018).  As has the Supreme Court of Appeals,
see Zain I, 438 S.E.2d at 504-05, and this court when it granted
Gardner's habeas petition, Ballard, 172 F. Supp. 3d at 935-96.
For its part, the Fourth Circuit appears reluctant to venture
beyond that which the Supreme Court has held.  See United States
v. Chavez, 894 F.3d 593, 2018 U.S. App. LEXIS 18022, at *9-10
(4th Cir. 2018); United States v. Kelly, 35 F.3d 929, 933 (4th
Cir. 1994).

represents."  469 U.S. 464, 471 (1985).  In other words,
"official-capacity suits generally represent only another way of
pleading an action against an entity of which an officer is an
agent," Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 n.55
(1978), and the same applies to suits against subdivisions of a
local government entity, such as a social services department,
see Brandon, 469 U.S. at 472 (discussing Monell).  So, "[f]or
the purpose of evaluating [Kanawha County's] potential liability
under § 1983, [this] opinion . . . equate[s] the actions of [the
Prosecuting Attorney] in his official capacity [and the County
Commission] with the actions of the county itself."  Id.

       Section 1983 provides the following, in relevant part:

    Every person who, under color of any statute,
    ordinance, regulation, custom, or usage, of any State
    . . . subjects, or causes to be subjected, any citizen
    of the United States or other person within the
    jurisdiction thereof to the deprivation of any rights,
    privileges, or immunities secured by the Constitution
    and laws, shall be liable to the party injured in an
    action at law, suit in equity, or other proper
    proceeding for redress . . . .

42 U.S.C.S. § 1983.  Local government units are "persons" under
§ 1983 and are subject to suit.  Monell, 436 U.S. at 690.  But
liability of a local government must be direct; a respondeat
superior theory of liability does not suffice.  See id. at 691.
Therefore, the Supreme Court instructs that a local government
is liable under § 1983 only "when execution of [the]

government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." <u>Id.</u> at 694; <u>see also</u> <u>Semple v. City of Moundsville</u>, 195 F.3d 708, 712 (4th Cir. 1999) ("[P]laintiffs seeking to impose liability on a municipality must, therefore, adequately plead and prove the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights.").

A plaintiff must show "that, through its deliberate conduct, the [local government] was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability . . . ." <u>Bd. of the. Comm'rs of Bryan Cty. v.</u> <u>Brown</u>, 520 U.S. 397, 404 (1997) (emphasis omitted). Furthermore, a "plaintiff must establish the state of mind required to prove the underlying [constitutional] violation" because "[§] 1983 itself 'contains no state-of-mind requirement independent of that necessary to state a violation' of the underlying federal right." <u>Id.</u> at 405 (quoting <u>Daniels v.</u> <u>Williams</u>, 474 U.S. 327, 330 (1986)).

A local government manifests a "policy or custom" in four ways:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003) (quoting Carter v. Morris, 164 F.3d 215, 218 (4th Cir. 1999)); see also Connick v. Thompson, 563 U.S. 51, 61 (2011).  Here, Gardner rests on the latter three.  Gardner Opp'n to Kanawha County Defs. 11.


A. Final Policymaking Authority


"[M]unicipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances": "where -- and only where -- a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question."  Pembaur v. City of Cincinnati, 475 U.S. 469, 480, 483 (1986).  "[W]hether a particular official has 'final policymaking authority' is a question of state law" and "is

itself a legal question to be resolved by the trial judge."

<u>Jett v. Dallas Indep. Sch. Dist.</u>, 491 U.S. 701, 737 (1989)

(emphasis omitted) (quoting <u>Pembaur</u>, 475 U.S. at 483), <u>overruled</u>

<u>on other grounds as recognized by</u> Dennis v. County of Fairfax,

55 F.3d 151, 156 n.1 (4th Cir. 1995).[12]


      Beginning with the Prosecuting Attorney's Office, West

Virginia Code § 7-4-1 governs the duties of a county prosecuting

attorney.   Those duties are described in broad terms:

> The prosecuting attorney shall attend to the criminal
> business of the state in the county in which he or she
> is elected and qualified and when the prosecuting
> attorney has information of the violation of any penal
> law committed within the county, the prosecuting
> attorney shall institute and prosecute all necessary
> and proper proceedings against the offender and may,
> in such case, issue or cause to be issued a summons
> for any witness the prosecuting attorney considers
> material.

W. Va. Code Ann. § 7-4-1;[13] see <u>State ex rel. Hamstead v.</u>

<u>Dostert</u>, 173 W. Va. 133, 138 (1984) ("When we speak of

---

[12] "There is a circuit split as to whether the 1991 amendments to
§ 1981 overruled" <u>Jett</u>.   <u>Burns v. Bd. of Cty. Comm'rs</u>, 330 F.3d
1275, 1288 n.10 (10th Cir. 2003) (collecting cases demonstrating
a circuit split).   The Fourth Circuit's position is that they
did not: "We do not believe that this aspect of <u>Jett</u> was
affected by the Civil Rights Act of 1991, which added subsection
(c) to § 1981."   <u>Dennis</u>, 55 F.3d at 156 n. 1.

[13] Whether, and over what, a prosecuting attorney exercises final
policymaking authority is one issue.   On behalf of whom the
prosecuting attorney exercises that authority is totally
separate.   Specifically, courts of appeals have found that
certain prosecuting attorneys in some capacities exercise their
policymaking authority on behalf of the state and are therefore
entitled to Eleventh Amendment immunity.   <u>See</u>, <u>e.g.</u>, <u>Carter v.</u>

'prosecutorial discretion,' we are speaking of what course of conduct is 'necessary and proper' given the circumstances in a particular case."). Notably, section 7-4-1 grants a county prosecuting attorney the authority to "institute and prosecute all necessary and proper proceedings" and to summon "any witness the prosecuting attorney considers material." Consequently, at this stage, the court is satisfied that the Prosecuting Attorney's Office possessed final policymaking authority over (A) which witnesses to call at a criminal trial and (B) which information to disclose to the defense.

Taking his allegations as true, Gardner has alleged sufficient facts to state a plausible claim that the Prosecuting Attorney's Office violated his constitutional rights. The 1993 decision of the Supreme Court of Appeals in Zain I establishes that Zain's testimony was unreliable. Gardner also alleges that Zain was woefully unqualified as an expert serologist.

---

City of Philadelphia, 181 F.3d 339, 242 (3d Cir. 1999). That issue was not raised, however, and thus the court does not address it. See U.S. ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency, 745 F.3d 131, 136 (4th Cir. 2014) ("arm-of-the-state status may well constitute an affirmative defense in the related Eleventh Amendment context") and see id. at 147 (Traxler, C.J., concurring in the judgment in part and dissenting in part) ("Although this court has not addressed the issue, the circuits that have considered similar assertions of arm-of-state status have uniformly concluded that it is an affirmative defense to be raised and established by the entity claiming to be an arm of the state.").

According to Gardner, the Prosecuting Attorney -- allegedly Forbes at the time -- knew, or at least should have known, that Zain was unreliable and unqualified before calling Zain at Gardner's trial, but the Prosecuting Attorney affirmatively decided to use Zain as an expert witness anyway.  Moreover, Gardner alleges that the Prosecuting Attorney failed to disclose this exculpatory Zain evidence.  Gardner was convicted, and his conviction was ultimately vacated because of the impact of Zain's testimony.  See Ballard, 172 F. Supp. 3d at 940.

Under these circumstances, Gardner has stated a viable claim that the Prosecuting Attorney's Office violated his constitutional rights under Giglio and Brady.  See Pembaur, 475 U.S. at 484-85 (finding that a county prosecutor violated the plaintiff's Fourth Amendment rights based on a single decision of a prosecutor with final policymaking authority).  Accordingly, Gardner has stated a plausible § 1983 claim against the Prosecuting Attorney as the official holding final policymaking authority.

B. Failure to Train

As earlier noted, a local government's failure to train subordinate employees can amount to a deprivation of rights under § 1983:

> In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983.  A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train.

Connick, 563 U.S. at 61 (citing Oklahoma City v. Tuttle, 471 U.S. 808, 822-23 (1985) (plurality opinion)).

Underscoring the difficulty in proving § 1983 liability for a failure to train, a plaintiff must establish that "a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of'" citizens.  Id. (alteration in original) (quoting City of Canton v. Harris, 489 U.S. 378, 388 (1989)).  Deliberate indifference "require[s] proof that a municipal actor disregarded a known or obvious consequence of his action."  Id. (quoting Bryan Cty., 520 U.S. at 410).  In other words, to exhibit deliberate indifference, a policymaker must have actual or constructive notice that a characteristic of the local government's training programs causes subordinate employees to violate the constitutional rights of citizens.  See id.; see also D'Ambrosio v. Marino, 747 F.3d 378, 387-388 (6th Cir. 2014) (stating a four-part test); Moody v. City of Newport News, 93 F. Supp. 3d 516, 537 (E.D. Va. 2015) (stating a three-part test).

Actual or constructive notice -- and corresponding deliberate indifference -- may be shown in two ways.  First, "in a narrow range of circumstances," a plaintiff can use a single incident to show deliberate indifference.  Connick, 563 U.S. at 63 (quoting Bryan Cty., 520 U.S. at 409)).  "[T]o prove deliberate indifference based on a single incident, a [p]laintiff must show that the constitutional violation at issue was the 'patently obvious' or 'highly predictable' consequence of the municipality's failure to provide additional specified training."  Carrero v. Farrelly, 270 F. Supp. 3d 851, 865 (D. Md. 2017) (quoting Connick, 563 U.S. at 64).  Single incident liability "is only available in situations where the underlying constitutional right is quite clear and is one that the subordinates reasonably can be expected to confront with some regularity."  Brown v. Mitchell, 308 F. Supp. 2d 682, 704-05 (E.D. Va. 2004); see also Connick, 563 U.S. at 64-65.

Second, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train."  Connick, 563 U.S. at 62 (quoting Bryan Cty., 520 U.S. at 409).  Importantly, in order for policymakers to have had notice, the similar violations and associated consequences must have revealed themselves to policymakers prior to the

deprivation of the plaintiff's rights.  See id. at 63 n.7
(quoting City of Canton, 489 U.S. at 395 (O'Connor, J.,
concurring in part and dissenting in part)) ("[C]ontemporaneous
or subsequent conduct cannot establish a pattern of violations
that would provide 'notice to the cit[y] and the opportunity to
conform to constitutional dictates . . . .'" (second and third
alterations in original)); see also O'Neal v. City of New York,
196 F. Supp. 3d 421, 435 (S.D.N.Y. 2016).

        Gardner is plainly foreclosed from pursuing a single-
incident theory against the Prosecuting Attorney's Office.  In
Connick, the Supreme Court held that "[f]ailure to train
prosecutors in their Brady obligations does not fall within the
narrow range of . . . single-incident liability."  563 U.S. at
64.  Since attorneys must complete rigorous legal training
during and after law school, pass a bar exam, and are
responsible for meeting and maintaining ethical and professional
standards, "recurring constitutional violations are not the
'obvious consequence' of failing to provide prosecutors with
formal in-house training about how to obey the law."  Id. at 64-
66.  That reasoning applies to the Prosecuting Attorney's
alleged Giglio violations as well, see Ekwunife v. City of
Philadelphia, 245 F. Supp. 3d 660, 676 (E.D. Pa. 2017)
(extending Connick's single incident-Brady holding to the use of

recanted testimony), and Gardner cannot prevail on a single-incident theory.

Nor has Gardner alleged a sufficient pattern of constitutional violations by untrained employees.  Viewed in the light most favorable to Gardner, the Prosecuting Attorney used Zain as a witness at a number of trials in the four to five years leading up to and including Gardner's trial.  During that time, prosecutors allegedly knew or should have known that Zain was unreliable and unqualified, yet called Zain as a witness in violation of Giglio and failed to disclose exculpatory Zain-related information in violation of Brady.  Gardner fails, however, to allege with any degree of specificity any training failure and how such failure related to his injuries.  Balt. City, 767 F.3d at 403 ("A plaintiff fails to state a claim only when he offers 'labels and conclusions' or formulaically recites the elements of his § 1983 cause of action." (quoting Iqbal, 556 U.S. at 678)).  Instead, Gardner formulaically recites that the Prosecuting Attorney's Office failed to train the prosecutors on how to select expert witnesses.  See Compl. ¶ 105 (Prosecuting Attorney "made decisions and set policy regarding the approval, enrollment and use of expert witnesses like Zain, but failed to provide adequate screening, training, and supervision and failed to adopt needed policies, with deliberate indifference to the

fact that a violation of federal rights is a highly predictable consequence. Better screening, training and supervision could have directly prevented the harm in this case. . . . ”). Accordingly, Gardner fails to state a plausible § 1983 claim against the Prosecuting Attorney for a failure to train his subordinates.

### C. Custom or Usage, Condonation, and Supervisory Liability

As expressly stated in the statute, a person's "custom" that deprives a citizen's constitutional or statutory rights violates § 1983.  42 U.S.C. § 1983.  The Fourth Circuit sometimes uses the labels "supervisor liability" or "custom by condonation," but the underlying elements are the same.  Compare King v. Rubenstein, 825 F.3d 206, 224 (4th Cir. 2016) (supervision), with Balt. City, 767 F.3d at 402-03 (condonation), with Morris, 164 F.3d at 218-19 (custom or usage).  See generally Spell v. McDaniel, 824 F.2d 1380, 1390-91 (4th Cir. 1987) (describing "custom or usage" liability in terms such as "condoned custom" and "knowledge . . . imputed to the supervisory personnel").

To prevail on a "custom or usage" theory, a plaintiff must demonstrate (1) a persistent and widespread practice by local government employees that posed a pervasive and

unreasonable risk of constitutional injury to citizens similar to the plaintiff; (2) actual or constructive knowledge of such practice by the governing body or official with policymaking authority; (3) exhibition of deliberate indifference or tacit authorization, or perhaps even specific intent, in failing to correct or stop the behavior; and (4) causation.  See King, 825 F.3d at 223-24; Balt. City, 767 F.3d at 402-03; Lytle, 326 F.3d at 473; Shaw, 13 F.3d at 799; Spell, 824 F.2d at 1385-91. "Constructive knowledge may be inferred from the widespread extent of the practices, general knowledge of their existence, manifest opportunities and official duty of responsible policymakers to be informed, or combinations of these." Spell, 824 F.2d at 1391.  Causation must be "sufficiently close," "such as to make the specific violation 'almost bound to happen, sooner or later,' rather than merely 'likely to happen in the long run.'"  Id.

Gardner has alleged enough factual matter, taken as true, to state a plausible custom or usage claim against the Prosecuting Attorney's Office.  As earlier noted, calling Zain as a witness violated Giglio, and the prosecutors' failure to disclose exculpatory Zain-related evidence violated Brady.  The Prosecuting Attorney allegedly knew of these violations, yet

nonetheless acquiesced in that practice, which directly caused Gardner's injury.


### D. Summary


Gardner has thus stated a plausible § 1983 claim against the Prosecuting Attorney's Office and, by extension, the County Commission of Kanawha County, under either a final policymaking authority or a custom or usage theory of liability.


### IX. Conclusion


In sum, Gardner's lone surviving claim is his § 1983 claim against the Prosecuting Attorney's Office and the County Commission.  For the foregoing reasons, it is ORDERED that

1. Forbes' motion to dismiss be, and hereby is, granted;

2. Kanawha County Defendants' motion to dismiss be, and hereby is, granted to the extent set forth below, and is otherwise denied;

3. Kanawha County, West Virginia be, and hereby is, dismissed as being a duplicative party of the County Commission;

4. Counts I through V against Forbes, Whitmyer, and Frail in their individual capacities be, and hereby are, dismissed according to absolute prosecutorial immunity;

5. Counts II, III, and V against the County Commission and the Prosecuting Attorney be, and hereby are, dismissed according to the immunity provided by the Gov't Tort Reform Act;

6. Count IV against the County Commission and the Prosecuting Attorney be, and hereby is, dismissed as time-barred; and

The Clerk is directed to transmit copies of this memorandum opinion and order to all counsel of record and to any unrepresented parties.

ENTER:  August 28, 2019

John T. Copenhaver, Jr.
Senior United States District Judge