IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

**JIMMIE C. GARDNER,**

      **Plaintiff,**

v.                                                      **Civil Action No. 2:17-cv-03934**
                                                              **Honorable John T. Copenhaver, Jr.**

**KANAWHA COUNTY COMMISSION and
KANAWHA COUNTY PROSECUTING
ATTORNEY, in his official capacity,**

      **Defendants.**

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS KANAWHA COUNTY PROSECUTING ATTORNEY AND KANAWHA COUNTY COMMISSION'S MOTION FOR SUMMARY JUDGMENT

**NOW COME** the Defendants, Kanawha County Prosecuting Attorney ("KCPA") and Kanawha County Commission ("KCC"), by and through counsel, Johnnie E. Brown, Daniel J. Burns and the law firm of Pullin, Fowler, Flanagan, Brown & Poe PLLC, pursuant to Rule 56 of the Federal Rules of Civil Procedure and in further support of their Motion for Summary Judgment, state and aver as follows:

### I.    FACTS AND PROCEDURAL HISTORY

As is evidenced by the facts alleged in the Complaint, this matter has a long history in the Court system that spans approximately thirty (30) years. *See generally*, ECF No. 1. To be succinct for this motion, Defendants hereby incorporate by reference, and as if stated fully herein, the *Facts and Procedural History* portion of its previously filed Motions to Dismiss. *See* ECF Nos. 33 and 78.

Through various Motions to Dismiss filed at the inception of this matter, all of the named Defendants, with the exception of Defendants KCPA and KCC, were dismissed from suit. (ECF Doc. 57). As it pertains to these Defendants, the Court granted their Motion to Dismiss in part, but

concluded that Plaintiff's "lone surviving claim is his [Count I] § 1983 claim against the Prosecuting Attorney's Office and the County Commission" based on its finding that Plaintiff "stated a plausible § 1983 claim against the Prosecuting Attorney's Office and, by extension, the County Commission of Kanawha County, under either a final policymaking authority or a custom or usage theory of liability." (ECF 57 at 63). Specifically, the Court announced that the Plaintiff has stated a viable claim that Defendant KCPA violated his constitution rights under Giglio and Brady. (ECF No. 57 at 56). The Court stated that this alleged violation has occurred under both a "final policymaking" theory as well as a "customer or usage" theory. Id. at 56, 62-63.

During the timeframe of the Plaintiff's underlying conviction, the elected Prosecutor for Kanawha County, West Virginia, was William Forbes, who held the office from January 1989 through December 2000. *See* Forbes Affidavit, Ex. A. During his tenure, Mr. Forbes oversaw a numbers of assistant prosecuting attorneys who were, at all times, advised of their duties under both Brady and Giglio. Id. at ¶5-10. The policy of Defendant KCPA under Mr. Forbes was compliance with and necessary disclosures pursuant to both Brady and Giglio. Id. at ¶11. As to Fred Zain, Mr. Forbes was not aware of any complaints, concerns, or objections to the reliability, credential or qualifications of Mr. Zain until sometime in late 1992, which resulted in a written inquiry to the then-head of the West Virginia State Police Jack Buckalew. Id. at ¶16-20; *See also* Gardner Letters, Ex. B. Despite being assured by the West Virginia State Police that their review did not require any further action, Mr. Forbes requested further investigation into Mr. Zain in 1993, which ultimately resulted in a formal investigation by the Supreme Court of the State of West Virginia. *See* Ex. A at ¶ 20-23; Ex. B.

As to the actual criminal trial of the Plaintiff, the same occurred in early 1990, with John Frail and Reagan Whitmyer appearing on behalf of the State of West Virginia. *See* Whitmyer

2

Affidavit, Ex. C. Whitmyer has stated that she was, generally, informed of her duties under both Brady and Giglio under Forbes' tenure are prosecutor. Id. As she did with every case they tried, Whitmyer fully complied with the necessary disclosures pursuant to both Brady and Giglio during Plaintiff's underlying criminal prosecution, which was the policy of Defendant KCPA under Forbes. Id. Similar to Mr. Forbes, Whitmyer had no knowledge or information regarding complaints, concerns, or objections to the reliability, credential or qualifications of Fred Zain prior to the 1992/1993 timeframe. Id.

Similarly, although not involved in Plaintiff's criminal prosecution, another assistant prosecutor, Donald Morris, served under Mr. Forbes. *See* Morris Affidavit, Ex. D. Mr. Morris has confirmed that he was informed of his duties under both Brady and Giglio and the KCPA's policy was to fully comply with the disclosure requirements under both cases. Id. Again, like Forbes and Whitmyer, Mr. Morris was not aware of any knowledge or information regarding complaints, concerns, or objections to the reliability, credential or qualifications of Fred Zain prior to the 1992/1993 timeframe. Id.

As to any alleged liability in this case, the facts establish that Defendant KCC lacked knowledge as to any concerns regarding Fred Zain. In discovery, Plaintiff stated that he "does not allege in the Complaint that KCC "presented, or otherwise caused the presentation of, false testimony from Zain." *See* Plaintiff's Responses to Discovery, Ex. E. Additionally, Plaintiff refers only to the allegations in the Complaint when asked the following: what facts support his belief that Defendant KCC failed to disclose exculpatory information regarding Fred Zain; the policy or custom of Defendant Kanawha County Commission that Plaintiff alleges violated his constitutional or statutory rights; the facts that support his belief that Defendant KCC adopted a policy or custom that Plaintiff alleges violated his constitutional or statutory rights; and, the facts that

3

support his belief that Defendant Kanawha County Commission adopted a policy or custom that Plaintiff alleges violated his constitutional or statutory rights. Id. This lack of substantive proof from the Plaintiff directly correlates with Mr. Forbes' statements that the KCC had no input, direct or indirect, into any matter pertaining to the KCPA with the exception of funding or other budgetary concerns. *See* Ex. A, at 26-31.

Therefore, for the reasons set forth herein, Defendants KCPA and KCC are entitled to summary judgment on Plaintiff's sole remaining claim under Count I as a matter of law. Specifically, Plaintiff cannot establish the necessary policy or custom required for Monell liability to attach. Furthermore, assuming Plaintiff can, there can be no showing by the Plaintiff that these Defendants had constructive knowledge of the likelihood of the subject policy would result in a Constitutional violation and cannot causally link the two together. Finally, Plaintiff can present no set of facts are trial that can establish final policymaking authority or a custom or usage theory of liability.

## II. **LEGAL STANDARD**

A Motion for Summary Judgment is to be granted to a Defendant if the pleadings, depositions, answers to Interrogatories, and admissions on file, together with the Affidavits, if any show that there is no genuine issue as to any material fact and that the Defendant is entitled to a judgment as a matter of law. F. R. Civ. P. 56; *Bellomy v. Union Concrete Pipe Co.*, 297 F. Supp. 261 (S.D.W. Va. 1969), *aff'd* 420 F.2d 1382 (4th Cir.), *cert. denied* 400 U.S. 904, 91 S. Ct. 144, 27 L. Ed. 2d 142 (1970); *Bowen v. Union Concrete Pipe Co.*, 299 F. Supp. 1109 (S.D.W. Va. 1969).

Although the initial burden is upon the movant to establish that no genuine issue of material fact remains, this burden may be satisfied with "affidavits, exhibits, depositions, and other discovery materials," *Barwick v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir. 1984), and is met when the movant

4

identifies those portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The burden then shifts to the party resisting the motion, who must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id., at 322.

"[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a jury could reasonably find for the plaintiff." Id., 477 U.S. at 252, 106 S.Ct. at 2512.

### III. LEGAL ARGUMENT

#### A. Plaintiff's sole remaining 42 U.S.C §1983 claim fails as a matter of law.

Following the ruling on Defendants' Motion to Dismiss, the Court determined that the Plaintiff has stated a *plausible* §1983 claim against these Defendants. (ECF No. 57 at pg. 63). First, the Court announced that Plaintiff alleged sufficient facts to state a *plausible* claim against these Defendants under Penbaur for violations of Brady v. Maryland, 373 US 83 (1963) and Giglio v. United States, 405 US 150 (1972), sunder a final policymaking authority theory. Id. at 55-56. Specifically, the Court centered on Plaintiff's allegations that Defendant KCPA knew, or should have known, that Fred Zain was "unreliable and unqualified" before he was called to testify as an expert witness in Plaintiff's trial. Id. The Court recognized that the Plaintiff has alleged that the Defendants failed to disclose this exculpatory evidence. Id. Additionally, the Court recognizes that Plaintiff has asserted a *plausible* custom or usage claim against Defendant KCPA for calling Fred

5

Zain as a witness while failing to make proper disclosures under Brady and Giglio. Id. at 61-63. However, as stated below, Plaintiff's sole §1983 fails as a matter of law.

Although this Court and the parties to this matter are fully aware of the language of §1983, it bears repeating for this Motion:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . .."

*See* 42 U.S.C. §1983 (2020).

To state a claim under §1983, "a plaintiff must establish three elements . . . : (1) the deprivation of a right secured by the Constitution or a federal statute; (2) by a person; (3) acting under color of state law." Jenkins v. Medford, 119 F.3d 1156, 1159-60 (4th Cir. 1997). Municipal entities are not "persons" under §1983. L. A. County v. Humphries, 562 U.S. 29, 34 (2010) (*citing* Monroe v. Pape, 362 U.S. 167 (1961)). However, in Monell, the Supreme Court held that municipalities are "persons" for purposes of 42 U.S.C. § 1983, and thus may be held liable for violations of civil rights, so long as the municipality has adopted or otherwise promulgated a policy or custom that violated the plaintiff's constitutional rights. *See* Monell v. New York City Dept. of Social Services, 436 U.S. 658, 690 (1978).

Under Monell, the existence of a constitutional violation is a predicate to a municipality's liability. *See* Los Angeles v. Heller, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point."); *see also* Waybright v. Frederick Cnty., 528 F.3d 199, 203 (4th Cir. 2008). Here, as the

Court has announced, Plaintiff has alleged that Defendant KCPA violated his constitutional rights by violating both Brady and Giglio with respect to the use of Fred Zain as an expert witness during his underlying criminal trial. However, as demonstrated below. Plaintiff has not, and cannot, demonstrate the predicate constitutional violation to succeed on any Monell claim.

### i. Plaintiff has not, and cannot, established a Brady or Giglio violation.

In Brady v. Maryland, 373 U. S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), the Supreme Court of the United States held that the government violates the Constitution's Due Process Clause "if it withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment." *See* Smith v. Cain, 565 U. S. 73, 75, (2012) (summarizing Brady holding). In Giglio v. United States, 405 U.S. 150 (1972), the Court required a federal prosecutor to reveal a promise of non-prosecution if a witness testified, holding that "whether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor." Id., at 154.

The Due Process Clause requires the government to disclose to the defendant prior to trial any exculpatory or impeaching evidence in its possession. *See* Strickler v. Greene, 527 U.S. 263, 280-281 (1999); Giglio v. United States, 405 U.S. 150, 153-155 (1972); Brady v. Maryland, 373 U.S. 83, 86-88); United States v. McLean, 715 F.3d 129. 142 (4th Cir. 2013). Due process if violated if the evidence in question: (1) is favorable to the Defendant, because it is either exculpatory or impeaching; (2) was suppressed by the government; and, (3) is material. Strickler, 527 U.S. at 281-282; McLean, 715 F.3d. at 142. Undisclosed evidence is material when its cumulative effect is such that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Kyles v. Whitley, 514 U.S. 419, 433-434 (1995).

As a preliminary matter, Plaintiff has not established that Defendant KCPA was in possession of any Brady or Giglio evidence prior to his underlying criminal trial. Plaintiff has

alleged that the then Prosecutor William Forbes knew, or at least should have known, that Zain was unreliable and unqualified before calling Zain at Gardner's trial, but affirmatively decided to use Zain as an expert witness anyway. *See generally* ECF No. 1. Plaintiff stated in discovery that Defendant KCPA presented Zain knowing, or with knowledge, that his findings were fraudulent or enhanced and that Zain had "questionable" academic qualifications as early as 1985. *See* Ex. E. However, Plaintiff has nothing beyond these baseless allegations.

During the timeframe of the Plaintiff's underlying conviction, the elected Prosecutor for Kanawha County, West Virginia, was William Forbes, who held the office from January 1989 through December 2000. *See* Forbes Affidavit, Ex. A. During his tenure, Mr. Forbes oversaw a numbers of assistant prosecuting attorneys who were, at all times, advised of their duties under both Brady and Giglio. Id. at ¶5-10. The policy of Defendant KCPA under Mr. Forbes was compliance with and necessary disclosures pursuant to both Brady and Giglio. Id. at ¶11. As to Fred Zain, Mr. Forbes was not aware of any complaints, concerns, or objections to the reliability, credential or qualifications of Mr. Zain until sometime in late 1992, which resulted in a written inquiry to the then-head of the West Virginia State Police Jack Buckalew. Id. at ¶16-20; *See also* Garner Letter, Ex. B. Despite being assured by the West Virginia State Police that their review did not require any further action, Mr. Forbes requested further investigation into Mr. Zain in 1993, which ultimately resulted in a formal investigation by the Supreme Court of the State of West Virginia. *See* Ex. A at ¶ 20-23; Ex. B.

As to the actual criminal trial of the Plaintiff, the same occurred with John Frail and Reagan Whitmyer appearing on behalf of the State of West Virginia. *See* Whitmyer Affidavit, Ex. C. Whitmyer has affirmatively stated that she as, generally, informed of her duties under both Brady and Giglio under Forbes' tenure are prosecutor. Id. As she did with every case she tried, Whitmyer

fully complied with the necessary disclosures pursuant to both <u>Brady</u> and <u>Giglio</u> during Plaintiff's underlying criminal prosecution, which was the policy of Defendant KCPA under Forbes. <u>Id.</u> Similar to Mr. Forbes, Whitmyer had no knowledge or information regarding complaints, concerns, or objections to the reliability, credential or qualifications of Fred Zain prior to the 1992/1993 timeframe. <u>Id.</u>

Similarly, although not involved in Plaintiff's criminal prosecution, another assistant prosecutor, Donald Morris, served under Mr. Forbes. *See* Morris Affidavit, Ex. D. Mr. Morris has confirmed that the was informed of his duties under both <u>Brady</u> and <u>Giglio</u> and the KCPA's policy was to fully comply with the disclosure requirements under both cases. <u>Id.</u> Again, like Forbes and Whitmyer, Mr. Morris was not aware of any knowledge or information regarding complaints, concerns, or objections to the reliability, credential or qualifications of Fred Zain prior to the 1992/1993 timeframe. <u>Id.</u>

In his discovery responses, Plaintiff also suggests that Defendant KCPA violated <u>Brady</u> by failing to provide "previously undisclosed forensic testing" performed by other members of the West Virginia State Police. *See* Ex. E. This allegation is based on a 1995 letter and a 1996 disclosure by then-Assistant Prosecuting Attorney Mary Beth Kershner. <u>Id.</u> However, Plaintiff has failed to show that Defendant KCPA had this potentially exculpatory evidence in its possession prior to or at the time of Plaintiff's criminal trial. Again, the unopposed affidavits set forth above establish that Defendant KCPA was not aware of this potential <u>Brady</u> evidence and, thus, cannot be held liable for its violation. Thus, Plaintiff has not, and cannot, establish that Defendant KCPA suppressed any evidence as he cannot prove that it was in Defendant KCPA's possession prior to or at the time of trial.

      ii.      **Any alleged <u>Brady</u> or <u>Giglio</u> violation, which is denied above, was not material to Plaintiff's underlying conviction.**

The inquiry regarding violations of <u>Brady</u> and <u>Giglio</u> also include inquiry into whether the allegedly suppressed evidence was material, i.e. the suppressed evidence would have impacted the trial. <u>Kyles v. Whitley</u>, 514 U.S. 419, 433-434 (1995). The testimony obtained from Fred Zain can easily be excluded from Plaintiff's criminal trial and adequate evidence still reaming to support his conviction for the assault of Ms. Galati. A review of Zain's trial testimony was inconsequential to Gardner's conviction, as Zain never identified Gardner as the perpetrator.

For instance, during the trial Mr. Zain was asked the following question: Now, how does Mr. Gardner's blood groupings – how do you compare those, first of all, with Mrs. Galati's case? *See* Ex. F. In the course of answering, Mr. Zain states, "[b]ut from the scientific standpoint, I don't have enough information to really make the comparison other than certain blood types." <u>Id.</u> He proceeds on to state, "[f]rom the standpoint of Mrs. Galati, I really have insufficient amount of information to really form a truly scientific opinion. Secondly, on Mrs. Ruckman's case, I can conclude that he is not excluded as having the possible semen donor based on the blood types which were identified." <u>Id.</u>

In following up on the questioning set forth above, Mr. Zain provided the following line of testimony:

    Q:    "And I believe you testified previously, Fred, that with regard to Mrs. Galati's case, basically the only thing you can tell us is that there was the presence of seminal fluid, is that correct?"
    A:    That's correct. From the information I have.
    Q:    With regards to Mrs. Ruckman's case, Jimmie Gardner is not excluded as being the semen donor?
    A:    That's correct.
    Q:    In other words, he could have donated semen?
    A:    He is in the category where he could have, yes, ma'am.

<u>Id.</u> From this response, Mr. Zain goes on to state that the grouping that Mr. Gardner matched was

.018% of the population, which means that only 2 out of every 1,000 people would be the same as Mr. Gardner's and matched what was found in Mrs. Ruckman. Id.

During cross-examination, Mr. Zain provided the following testimony relevant to this Motion:

Q: Now, what I want to ask you about to make sure I understand what we're talking about here, if you were to make a comparison of what was found on Wilma Galati's vaginal swaps with Jimmie Gardner's blood types, if I understand this process correctly, then you – if all other things being appropriate -- you would have to exclude Mr. Gardner because he was type A and there was no ABO type A found on the vaginal swab.

A: That's correct. There was no ABO type A identified on the vaginal swab.

Q: Okay. And that would – that finding would exclude him from consideration as the person who attacked Wilma Galati, that determination, is that correct?

A: …I can't say one way or the other whether the blood [types] came from the semen or whether it came from the vaginal fluid specifically …[t]o answer your question directly, didn't, in fact, all the blood characteristics identified did come from the semen donor then it would exclude Mr. Gardner, but there's no way of me knowing one way or another at least with the testing that was available at the time.

Id. Later, in follow up, Mr. Zain provided the following testimony during cross examination:

Q: …In other words, what you're saying is that you determined that you were unable to express an opinion as to whether or not Jimmie Gardner should be excluded because there was an inadequate amount of seminal material to make this comparison?

A: Absolutely.

Id.

Following the initial trial, there were two (2) DNA tests subsequently performed. First, on January 26, 1990, Cellmark Diagnostics of Germantown, Maryland, issued a report concerning the exhibits they received on May 31, 1989. *See* Ex. G. They stated they had insufficient quantity of high molecular weight human DNA to continue testing as it related to Wilma Galati, and that the DNA banding pattern obtained from the swaps of Lilian Ruckman matched the DNA banding

11

pattern for Lilian Ruckman. Id. This report goes on to state that a comparison of the DNA patterns identified suspect 1, Jimmie Gardner, as being the source of the seminal stain. Id. Second, approximately six (6) years later, a second analysis was done by LabCorp of Research Triangle Park, North Carolina, and they found that for the "sperm fraction from the slides of Wilma Galati and Lilian Ruckman are consistent with the DNA profile obtained from the blood sample of Jimmie Gardner." *See* Ex. H. They go on to write that "therefore, Jimmie Gardner cannot be excluded as the source of the genetic material on the samples." Id.

As this Court is aware, Plaintiff was convicted only on the charges he faced as a result of his attacked on Ms. Galati, not on Ms. Ruckman. As the testimony above clearly demonstrates, the testimony provided by Mr. Zain is essentially a non-issue. Furthermore, it is clear that the deciding factor in the Galati conviction, not present in the Ruckman case, was the presence of a fingerprint belong to the Plaintiff. Turning to the fingerprint evidence, a latent fingerprint was taken from the vase found in Mrs. Galati's home. The trial testimony of Charleston Police Officer Gary Smith is that he took the vase from the home, picking it up with two (2) pens, and then delivered it to Charleston Police Officer Kenneth Cartwright. *See* Ex. I. Kenneth Cartwright then stated that he received the vase from Officer Smith and took the vase to the State Police on or about May 18, 1987, and in his presence, Lieutenant Shumate, with the West Virginia State Police, took a photograph and obtained a copy of the latent fingerprint from the vase. *See* Ex. J. However, no comparison was done until May 8, 1989, by Lieutenant Shumate, who testified that the print contained on the vase matches the left middle finger of Jimmie Gardner and testified that there were more than ten (10) characteristics of the print that matched Mr. Gardner's left middle finger. Id.

To date, the fingerprint evidence has never been discredited in the conviction of the Plaintiff relating to Ms. Galati's attack. In fact, the fingerprint evidence was evaluated again on August 8, 2016,

by the State Police, specifically, Stephen C. King, Forensic Analyst. *See* Ex. K. He writes, "[t]he latent fingerprint was identified was identified to the left middle finger impression of this individual [Gardner]." Id. Furthermore, in the case now before the Court, Plaintiff has not retained an expert to provide any opinions with respect to the subject latent print. *See* Ex. L. It was this fingerprint on the vase inside the Galati home, not DNA evidence and the testimony of Fred Zain, that connected Plaintiff to the attack. As such, Plaintiff is left for a "but for" theory of causation: "but for" the testimony of Fred Zain he would not have been convicted. As shown above, this is neither the case factually nor is the same sufficient based upon Spell to defeat summary judgment in this matter.

### B. Plaintiff cannot prevail on either a custom/policy or on a "final policymaker" theory against Defendant Kanawha County Commission.

Defendant KCC's liability as a local government must be direct and *respondeat superior* theory of liability does not suffice as "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694-95 (1978). Accordingly, the Supreme Court of the United States instructs that a local government is liable under § 1983 only "when execution of [the] government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Monell, 436 U.S. at 694. Further,

> A local government manifests a "policy or custom" in four ways:
>
> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

(ECF 57 at 53.).

Here, Defendant KCPA clearly, indisputably functions as a separate entity from the

13

Defendant KCC, unlike Monell where the City of New York's Department of Social Services had no greater separate identity from the City than did the Director of the Department acting in his official capacity. *See* Monell, 436 U.S.C. at 661 n. 2 (plaintiffs alleged that New York had a citywide policy of forcing women to take maternity leave after the fifth month of pregnancy unless a city physician and the head of an employee's agency allowed up to an additional two months of work which defendants did not deny); *id.* at 662 n. 4 ("Petitioners conceded that the Department of Social Services enjoys the same status as New York City for *Monroe* purposes."); *Brandon*, 469 U.S. at 472 (discussing *Monell*). Accordingly, in *Monell*, the Supreme Court equated the actions of the Director of the Department in his official capacity with the actions of the city itself.

In the instant matter, however, dispositive to Plaintiff's § 1983 claim against Defendant KCC, Defendant KCPA is autonomous from the KCC and, instead, functions as the prosecutorial arm of the State of West Virginia. The KCPA is not an agent of the KCC concerning prosecutorial functions, and the KCC exercises no oversight over the KCPA for prosecutorial functions. The prosecuting attorney for any county is expressly elected by county voters, pursuant to Article IX, § 1, of the West Virginia Constitution, and their powers are statutorily defined under West Virginia Code § 7-4-1. *See* W. Va. Const. art. IX, § 1 ("[t]he voters of each county shall elect . . . a prosecuting attorney . . . who shall hold . . . office[] for the term of four years"); State ex rel. Morrisey v. W. Va. Office of Disciplinary Counsel, 234 W. Va. 238, 256, 764 S.E.2d 769, 787 (2014) (Article IX, § 1 "does not in and of itself set out the duties of the prosecutor. The authority for setting out the duties of the prosecutor is contained in Article 4, § 8 of the Constitution, which provides that '[t]he legislature, in cases not provided for in this Constitution, shall prescribe, by general laws, the . . . powers and compensation of all public offices[.]' Pursuant to its constitutional authority, the Legislature sets out the duties of prosecutors in W. Va. Code § 7-4-1 (1971) (Repl. Vol. 2010)").

Although the KCC is charged under the West Virginia Constitution and W. Va. Code 7-1-3 with fiscal governance of the County's monies and provides monies to ensure the operation of the KCPA, the KCC does not exercise any power over the KCPA, but for providing funds to operate. *See, e.g.*, Bibbs v. Newman, 997 F. Supp. 1174, 1181-82 (S.D. Ind. 1998) (reasoning that "a prosecuting attorney does not exercise county power and does not answer to county authorities except for seeking 'necessary' funds to operate the office" and "[w]eighing against the limited significance of the county appropriations for office operations are the prosecuting attorney's role as a state official under the state constitution" in holding that a prosecuting attorney acts as an officer of the state when hiring and firing deputy prosecuting attorneys and, thus, entitled to Eleventh Amendment immunity as the prosecuting attorney is not a "person" subject to suit for damages under § 1983 in his official capacity).

Moreover, KCC possesses no powers or authorities over the KCPA's autonomous prosecutorial operations on behalf of the State related to Plaintiff's criminal prosecution which underlies his claims. The KCC has no authority of the grand jury, who is prosecuted, or any policy of the KCPA. That West Virginia Constitution and West Virginia Code gives no authority to the KCC to do any of these acts or anything like onto it. KCC is a constitutionally-created body that possesses only such powers expressly conferred by the West Virginia Constitution and the Legislature through laws enacted pursuant to the West Virginia Constitution: "The county [commission] is a corporation created by statute, and possessed only of such powers as are expressly conferred by the Constitution and legislature, together with such as are reasonably and necessarily implied in the full and proper exercise of the powers so expressly given. It can do only such things as are authorized by law, and in the mode prescribed." Syl. Pt. 3, Barbor v. Cnty. Court of Mercer Cnty., 85 W. Va. 359 (1920); Syl. Pt. 1, State ex rel. Cnty. Court v. Arthur, 150 W. Va. 293, 145 S.E.2d 34, (1965). Article IX, § 11

15

sets forth county commissions' powers and expressly provides, "commissions may exercise such other powers, and perform such other duties, <u>not of a judicial nature</u>, as may be prescribed by law". W. Va. Const. art. IX, § 11 (emphasis added). Accordingly, the West Virginia Constitution expressly prohibits KCC from acting in a judicial capacity which includes the KCPA's quasi-judicial operations. *See* Syl. Pt. 3, *State v. Boyd*, 160 W. Va. at 234, 233 S.E.2d at 710 (holding, "[t]he prosecuting attorney occupies a quasi-judicial position in the trial of a criminal case. . . It is the prosecutor's duty to set a tone of fairness and impartiality, and while he may and should vigorously pursue the State's case, in so doing he must not abandon the quasi-judicial role with which he is cloaked under the law.").

As the Court has narrowed the sole cause of action to violations of <u>Giglio</u> and <u>Brady</u> as it pertains to Fred Zain, Plaintiff has put forth no evidence, testimony or otherwise that would establish a theory of custom/policy or finally policymaker liability. In discovery, Plaintiff stated that he "does not allege in the Complaint that KCC "presented, or otherwise caused the presentation of, false testimony from Zain." *See* Ex. E. Additionally, Plaintiff refers only to the allegations in the Complaint when asked the following: what facts support his belief that Defendant KCC failed to disclose exculpatory information regarding Fred Zain; the policy or custom of Defendant Kanawha County Commission that Plaintiff alleges violated his constitutional or statutory rights; the facts that support his belief that Defendant KCC adopted a policy or custom that Plaintiff alleges violated his constitutional or statutory rights; and, the facts that support his belief that Defendant Kanawha County Commission adopted a policy or custom that Plaintiff alleges violated his constitutional or statutory rights. <u>Id.</u> Finally, when asked for proof that KCC knew, or should have known, that Fred Zain was unreliable and unqualified, the Plaintiff simply states that "Upon information and belief, this information was conveyed to one or more members of KCPA, and possibly KCC." <u>Id.</u>

16

What can be established from the record in this case is that Defendant KCC lacked knowledge as it was not involved in any way with the operation of the KCPA. In fact, William Forbes stated that, during his tenure, the Kanawha County Commission was not involved, directly or indirectly, in any activity of criminal prosecution, such as grand or petit jury, conducted by the Office of the Kanawha County Prosecuting Attorney. *See* Ex. A. Specifically, Defendant KCC was not involved in any case handling decisions such as the production of evidence, motion practice, or the evaluation of evidence in any criminal prosecution conducted by the Office of the Kanawha County Prosecuting Attorney. Id. Furthermore, Mr. Forbes affirmatively states that the Kanawha County Commission was not involved in the selection of, retention of, evaluation of, or strategy pertaining to witnesses in any criminal prosecution conducted by the Office of the Kanawha County Prosecuting Attorney. Id. Ultimately, Mr. Forbes affirmatively declared that Defendant KCC was not involved, directly or indirectly, in the day-to-day operations of the Office of the Kanawha County Prosecuting Attorney wit the exception of funding and budgetary concerns. Id.

Accordingly, as the KCPA does not answer to the KCC, § 1983 liability predicated on the KCPA's actions, which may not be equated with that of the KCC, should not be imputed upon KCC. Therefore, any imputation of liability under a theory of respondeat superior fails because as separate, distinct entities, the KCC cannot be held liable for the actions of the KCPA.

### IV. CONCLUSION

WHEREFORE, for the foregoing reasons, Defendants, Kanawha County Prosecuting Attorney and Kanawha County Commission respectfully request that this Court enter an order granting it Summary Judgment and dismissing this matter against it, with prejudice, as well as all other and further relief, in equity or otherwise, that this Court deems just and proper.

**KANAWHA COUNTY COMMISSION and KANAWHA COUNTY PROSECUTING ATTORNEY**

**By Counsel,**

*/s/ Johnnie E. Brown*

Johnnie E. Brown, WV State Bar No. 4620
Daniel J. Burns, WV State Bar No. 11866

*PULLIN, FOWLER, FLANAGAN, BROWN & POE, PLLC*
JamesMark Building
901 Quarrier Street
Charleston, WV 25301
Telephone:  (304) 344-0100
Facsimile:  (304) 342-1545

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

JIMMIE C. GARDNER,

    Plaintiff,

v.                                                   Civil Action No. 2:17-cv-03934
                                                  Honorable John T. Copenhaver, Jr.

KANAWHA COUNTY COMMISSION, and
KANAWHA COUNTY PROSECUTING
ATTORNEY, in his official capacity,

    Defendants.

### CERTIFICATE OF SERVICE

    The undersigned, counsel of record for Defendant, Kanawha County Prosecuting Attorney, does hereby certify on this 8th day of September 2020, that a true copy of the foregoing *"MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS KANAWHA COUNTY PROSECUTING ATTORNEY AND KANAWHA COUNTY COMMISSION'S MOTION FOR SUMMARY JUDGMENT"* thereof was served upon opposing counsel electronically using the CM/ECF system and, to those not participating in electronic filing, by delivering the same, via U.S. Mail, postage prepaid, sealed in an envelope, and addressed as follows:

Robert P. Dunlap, Esquire
Dunlap & Associates
208 Main Street
Beckley, WV 25801
*Counsel for Plaintiff*

Andrew M. Weiner, Esquire
A. Scott Bolden, Esquire
Reed Smith LLP
1301 K Street NW, Suite 1000
Washington, DC 20005
*Counsel for Plaintiff*

                                                             */s/ Johnnie E. Brown*
                                                           Johnnie E. Brown, WV State Bar No. 4620
                                                           Daniel J. Burns, WV State Bar No. 11866

19

***PULLIN, FOWLER, FLANAGAN, BROWN & POE, PLLC***
JamesMark Building
901 Quarrier Street
Charleston, WV 25301
Telephone: (304) 344-0100
Facsimile: (304) 342-1545