UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

JIMMIE C. GARDNER,

       Plaintiff,

v.                                    Civil Action No. 2:17-cv-03934

KANAWHA COUNTY COMMISSION;
and KANAWHA COUNTY PROSECUTING
ATTORNEY, in his official
capacity;

       Defendants.

<u>MEMORANDUM OPINION AND ORDER</u>

       Pending is defendants Kanawha County Commission
("County Commission") and Kanawha County Prosecuting Attorney's
("Prosecuting Attorney") motion for summary judgment, filed
September 8, 2020.  ECF No. 100.

## I.  Background

       Much of the factual background of this action has been
stated in the court's August 28, 2019 memorandum opinion and
order on several motions to dismiss.  See <u>Gardner v. Kanawha
Cnty.</u>, No. 2:17-cv-03934, 2019 WL 4072712 (S.D. W. Va. Aug. 28,
2019) (ECF No. 57).  The court recites the following points
pertinent to the pending motion.

On May 16, 1987, an individual beat and raped Wilma Galati and beat her mother, Bethel Ferrell, after breaking into their Kanawha City home.  See Gardner v. Ballard, 172 F. Supp. 3d 925, 930, 930 n. 6 (S.D. W. Va. 2016).  On July 24, 1987, Lillian Ruckman was similarly attacked and raped in her Kanawha City home.  Id.

In May 1989, plaintiff Jimmie C. Gardner was indicted in the Circuit Court of Kanawha County on various counts relating to the 1987 assaults of these women.  ECF No. 18-1, at 49-54; ECF No. 57, at 3.  On February 1, 1990, a jury convicted him of sexual assault, robbery, and burglary by breaking and entering, all of which related to the May 16, 1987 attack on Galati.  See ECF No. 18-1, at 49-54; ECF No. 103-1.  Gardner was also convicted of felony assault for the attack of Ferrell.  See ECF No. 18-1, at 49-54; ECF No. 103-1.  He was acquitted of the charges relating to the Ruckman assault.  See ECF No. 18-1, at 49-54; ECF No. 103-1.  The court sentenced Gardner on March 5, 1990 to a term of up to 110 years' incarceration.  ECF No. 103-1.

Key evidence adduced at trial included the testimony of witness Fred Zain, the former head of the Serology Division at the West Virginia State Police Crime Laboratory.  Zain had performed forensic reports relating to the two assaults at issue

in Gardner's trial, one of which identified seminal fluid samples taken from Galati as belonging to an individual with ABO Type O blood.  Ballard, 172 F. Supp. 3d at 932.  A separate forensic report from Zain concluded that the blood type of a different suspect, Gary Hatchett, contained ABO Type O blood and was consistent with the Galati samples.  Id.  A forensic report relating to Gardner himself, however, revealed that he had ABO Type A blood.  Id.

Contrary to those reports, Zain testified on direct examination that with regard to the Galati case, "there's really no blood typings as far as the ABO" and that the ABO blood type from the Galati sample was "certainly not showing up."  ECF No. 100-6, at 5-6.  He concluded that "[f]rom the standpoint of Ms. Galati, I really have an insufficient amount of information to really form a true scientific opinion."  Id. at 6.  On cross-examination, Zain indicated that blood typings did show up in the Galati samples but that there was no way of knowing whether they derived from seminal or vaginal fluid.  Id. at 12-13.  He then stated that he could not exclude Gardner from consideration as the perpetrator of the assault.  Id. at 13.  Zain also testified, however, that he found "an adequate amount of seminal fluid" in the Galati sample to conclude that Gary Hatchett's

genetic markers were consistent with those of the sample.  Id.
at 14; Ballard, 172 F. Supp. 3d at 935.

Several years after Gardner's conviction, the Supreme
Court of Appeals of West Virginia issued In re: W. Va. State
Police Crime Lab., 438 S.E.2d 501 (W. Va. 1993) ("Zain I"),
following an investigation into Zain's practices at the serology
lab.  In a unanimous opinion by Justice Thomas B. Miller, the
Supreme Court first noted:

> This case is an extraordinary proceeding arising from
> a petition filed with this Court on June 2, 1993, by
> William C. Forbes, Prosecuting Attorney for Kanawha
> County, requesting the appointment of a circuit judge
> to conduct an investigation into whether habeas corpus
> relief should be granted to prisoners whose
> convictions were obtained through the willful false
> testimony of Fred S. Zain, a former serologist with
> the Division of Public Safety.  On June 3, 1993, in
> response to the petition, we entered an order
> appointing the Honorable James O. Holliday, a retired
> circuit judge, to supervise an investigation of the
> Serology Division at the West Virginia State Police
> Crime Laboratory.  On November 4, 1993, after an
> extensive, five-month investigation, Judge Holliday
> filed his report with this Court, a copy of which is
> attached as an Appendix to this opinion.

Id. at 502-03.

After reviewing Judge Holliday's report, the court
found that Zain had a "long history of falsifying evidence in
criminal prosecutions" and that his "pattern and practice of
misconduct completely undermined the validity and reliability of
any forensic work he performed or reported . . . ."  Id. at

4

503-04.  The court agreed with Judge Holliday that "as a matter of law, any testimonial or documentary evidence offered by Zain at any time in any criminal prosecution should be deemed invalid, unreliable, and inadmissible in determining whether to award a new trial in any subsequent habeas corpus proceeding" brought by a defendant who was convicted after Zain offered testimony at trial.  Id. at 506.  The court adopted Judge Holliday's report, appended it to its opinion, and ordered its immediate implementation.  Id. at 508.

Gardner accordingly sought habeas relief in the Circuit Court of Kanawha County, which "avoided a final ruling on the merits, despite being ordered to conduct a full evidentiary hearing multiple times by the [Supreme Court of Appeals of West Virginia]."  Ballard, 172 F. Supp. 3d at 928. After years of inaction by the circuit judge assigned to the case, he filed a 28 U.S.C. § 2254 petition for a writ of habeas corpus in 2012.  Id.  United States District Judge Joseph R. Goodwin issued a writ on March 25, 2016, concluding that the State had violated his due process rights by obtaining a conviction based upon false testimony from Zain.  See id. at 935-36.  With regard to the falsity of Zain's testimony, Judge Goodwin specifically found that:

> Zain's testimony that he was not sure whether the
> results from the Galati sample were from semen or
> vaginal fluid directly contradicted his June 11, 1987
> lab report, which stated that the blood typing was
> performed on the "seminal fluid identified on the
> vaginal swab."  Zain further stated that, based upon
> an inadequate amount of seminal fluid in the Galati
> sample, he could reach no conclusions about Gardner's
> involvement with Galati's rape, even though he had
> made such a conclusion regarding Gary Hatchett using
> the same findings.

Id. at 935.  Judge Goodwin ordered that Gardner be retried or

released within 60 days, and the Prosecuting Attorney ultimately

dropped the case.  Id. at 941; see also ECF No. 1, at 80-84.

Gardner filed the instant action on September 6, 2017,

seeking relief against various defendants for their roles in his

investigation and trial.  ECF No. 1.  The Prosecuting Attorney

and the County Commission are the only remaining defendants, and

only 42 U.S.C. § 1983 claims for violations of Gardner's due

process rights under Brady v. Maryland, 373 U.S. 83 (1963), and

Giglio v. United States, 405 U.S. 150 (1972), remain.  See ECF

No. 57, at 63-64 (August 28, 2019 Memorandum Opinion and Order

dismissing all other claims except those alleged against

defendant Charleston Police Department, which was dismissed as a

defendant on March 28, 2019 (ECF No. 54)).

The parties have offered several pieces of evidence

relevant to the present analysis.  The defendants offer the

affidavits of individuals who served as Kanawha County

prosecutors at the time of Gardner's trial.  First, they provide the affidavit of William C. Forbes, who served as the elected Prosecuting Attorney from 1989 to 2000.  ECF No. 100-1.  Forbes avers that he advised Assistant Prosecuting Attorneys of their duties regarding disclosure of exculpatory and impeachment evidence under <u>Brady</u> and <u>Giglio</u>.  <u>Id.</u> at ¶¶ 6-9.  He states that he ensured compliance with <u>Brady</u> and <u>Giglio</u> disclosure requirements and that he did not have or imply a policy of withholding such evidence.  <u>Id.</u> at ¶ 11.  Forbes also asserts that although he is aware that Assistant Prosecuting Attorney Reagan Whitmyer called Zain at Gardner's trial, he "was not aware of any complaints, concerns, or objections to the reliability, credential[s,] or qualifications of Fred Zain" prior to or during the trial.  <u>Id.</u> at ¶¶ 13, 16-17.

Forbes indicates that he was initially "advised" that he should "ask about Fred Zain" in 1992, well over two years after the trial.  <u>Id.</u> at ¶ 18.  He states that he accordingly inquired into "any irregularities, inconsistencies, or concerns regarding" Zain's work.  <u>Id.</u> at ¶ 19.  The defendants have tendered Forbes' November 6, 1992 letter to Jack Buckalew, then-Superintendent of the West Virginia State Police, in which Forbes stated:

> Obviously, I am concerned about the integrity of Fred
> [Zain's] testimony in cases in which we obtained
> convictions . . . . In order for me to protect the
> integrity of our cases, it is necessary that I know
> the specifics of [Zain's] misconduct.  I do not want
> to be a part of any violation of the civil rights of
> any defendant.  I do not want any misconduct on
> anyone's part to cause an innocent person to be
> convicted of a crime, nor do I want to deny any
> defendant (innocent or guilty) a fair trial.

ECF No. 100-2, at 4.  Buckalew responded on November 10, 1992

that the State Police had conducted a review of Zain's files and

that no further action "with respect to any of Zain's cases" was

necessary.  Id. at 5; ECF No. 100-1, at ¶ 20.

However, Forbes avers, T.L. Kirk, who soon replaced

Buckalew as Superintendent, requested that Forbes himself take

further investigative action in April of 1993.  ECF No. 100-1,

at ¶ 21.  Forbes then filed a petition on June 2, 1993, in the

Supreme Court of Appeals of West Virginia, requesting the

appointment of a circuit judge to investigate Zain's conduct,

which ultimately culminated in Zain I.  Id. at ¶¶ 22-23; see

also Zain I, 438 S.E.2d at 502-03.

Forbes continues that during his tenure as the

Prosecuting Attorney, the County Commission "was not involved,

directly or indirectly, in any activity of criminal prosecution

. . . conducted by the Office of the Kanawha County Prosecuting

Attorney" and that the County Commission "was not involved in

any case handling decisions such as the production of evidence,

motion practice, or the evaluation of evidence in any criminal prosecution . . . ." Id. at ¶¶ 26-27.  Forbes avers that the County Commission "was not involved in the selection of, retention of, evaluation of, or strategy pertaining to witnesses in any criminal prosecution" and that the County Commission's only involvement with the Prosecuting Attorney concerned "funding or other budgetary concerns." Id. at ¶¶ 28, 31.

        The defendants also offer the affidavits of Reagan E. Whitmyer and John J. Frail, the Assistant Prosecuting Attorneys who served as trial counsel in Gardner's case and called Zain as a witness.  ECF No. 100-3, at ¶¶ 3, 12, 14; ECF No. 105-2, at ¶¶ 3, 15.  These prosecutors affirm that Forbes advised them of disclosure duties under Brady and Giglio, they were required to make appropriate disclosures, they were not aware of any policy of withholding of Brady and Giglio materials, and they complied with their duties generally and in Gardner's case.  ECF No. 100-3 at ¶¶ 6-11, 13; ECF No. 105-2, at 6-11, 13.  They also state that they were unaware of "complaints, concerns, or objections to the reliability, credential[s,] or qualifications of Fred Zain" prior to or during Gardner's trial.  ECF No. 100-3, at ¶¶ 17-18; ECF No. 105-2, at ¶¶ 17-18.

The defendants additionally provide the affidavit of Donald P. Morris, an Assistant Prosecuting Attorney who was not directly involved in the Gardner trial but worked for the Prosecuting Attorney in 1990.  ECF No. 100-4, at ¶ 3.  Morris' affidavit largely echoes those of Whitmyer and Frail.  He asserts that he complied with Brady and Giglio and that Forbes advised him of his duties under those cases while requiring the appropriate disclosures.  Id. at ¶¶ 6-10.  He states that he was unaware of any policy of withholding Brady or Giglio evidence. Id. at ¶ 11.  He also avers that he was not aware of any complaints or concerns about Zain prior to or during Gardner's trial.  Id. at ¶¶ 12-13.

Gardner offers the following in support of his position opposing summary judgment.  First, he offers 1985 correspondence between Kenneth W. Blake, Officer in Charge of the West Virginia State Police's Criminal Identification Bureau, and personnel from the Laboratory Division of the FBI Academy. ECF No. 103-2.  Pursuant to "an internal investigation being conducted within" the Criminal Identification Bureau, Blake inquired about Zain's performance in two FBI Academy serology courses.  Id. at 2.  The FBI responded that Zain was an attendee at a 1977 Basic Forensic Serology course, "scored well below the class average on [two] examinations [administered during the

10

class,] and finished below the passing grade for the course."

Id. at 3.  Additionally, the FBI confirmed that Zain had attended a graduate-level 1978 Biochemical Methods in Bloodstain Analysis course and performed "well below the class average." Id.

Gardner also offers the December 17, 2019 testimony of Ted Albert Smith, who was hired as a bench scientist in 1985 under Zain and who replaced Zain as head of the Serology Division for the West Virginia State Police in 1989 "around July."  ECF No. 103-3, at 17:21-18:3.[1]  Smith indicates that Zain moved to Texas after he left the West Virginia State Police, and

---

[1]    Smith's deposition was taken in a separate but related civil case in the Circuit Court of Kanawha County, Gardner v. West Virginia, No. 17-C-1267, which was filed on September 7, 2017, a day after the instant action commenced.  ECF No. 18-1, at 1-2; ECF No. 103-3.  The defendants assert that this testimony should be disregarded inasmuch as the plaintiff did not disclose that the deposition had been taken in the state court case when he served discovery responses in this action on February 10, 2020.  ECF No. 105, at 2-3.  They also contend that the defendants in the state court case are different from those in the instant action and that counsel for the defendants in this action were not present for the deposition.

However, a cursory look at the plaintiff's February 10, 2020 discovery responses reveals that Gardner did, in fact, disclose the existence of the deposition.  ECF No. 105-1, at 16. Further, the attorneys representing the State of West Virginia in Gardner v. West Virginia belong to the same law firm as those representing the defendants in this action, Pullin, Fowler, Flanagan, Brown & Poe, PLLC.  The court declines to disregard the evidence inasmuch as the defendants have failed to offer compelling reasons or a specific legal basis for doing so.

it appears, based on Judge Holliday's report, that Zain continued to perform similar serological work after he arrived in Texas.  See id. at 71:16-17; Zain I, 438 S.E.2d at 512.

According to Smith, other individuals who remained employed at the lab were asked to testify in Zain's place during trials.  Id. at 73:9-73:13.  Smith indicates that while other serologists prepared for such testimony, "it became troublesome for me and for the others that we couldn't quite find all of the data, or the way it was reported didn't seem to be consistent with the way that we were currently reporting."  Id. at 73:21-74-1.  Smith also states that the lab received "a lot of criticism" from state prosecutors, including those from Kanawha County, after Zain left the lab "[b]ecause they felt like the quality of the opinions that they were getting from us [weren't] as good of quality as the opinion[s] that they used to get from Fred."  Id. at 74:6-74:9.  He affirms that lab personnel informed prosecutors, including Forbes and Whitmyer, that Zain's reports would have to be rewritten if lab serologists were going to testify to their subject matter.  Id. at 74:21-75:6.  At that point in his testimony, Smith was asked, "What did the prosecutor tell you when you said that's what you needed to do?" to which Smith responded, "Well, they let us do what we needed to do.  And sometimes we both testified.  So we would testify to

what we were comfortable with, and he [Zain] would testify to what he was comfortable with." Id. at 75:7-75:13.

Gardner's counsel probed the timeline of Smith's knowledge regarding Zain's unreliability and poor credentials,[2] but Smith's responses to counsel's questions do not evidence such knowledge prior to 1991. After being asked whether he had "knowledge at any time prior to 1990 as to any issue with Mr. Zain's qualifications or training," Smith states that he cannot recall whether he had knowledge of such issues prior to 1990 but that he had become aware of them by "sometime in 1991." Id. at 82:4-83:11. More specifically, Smith states, "I was at the FBI in '91 and came back. So that would have been sometime in 1991. So by 1991 I was aware." Id. at 83:9-83:11. Further, he relates that he could not recall when he first instructed serology lab personnel not to accept Zain's work at face value and reissue the reports Zain had written. Id. at 72:23-73:5. He does, however, indicate that he began, after a 1992 State Police audit of Zain's work, to view Zain as "pro-prosecution" in the sense that Zain "went beyond scientific soundness in

_____

[2]      Andrew P. Weiner and Robert P. Dunlap, II deposed Smith on behalf of Gardner in the parallel state court case.  ECF No. 103-3.  They are also counsel of record in the instant action.

order to strengthen his interpretation of the results." Id. at 72:17-72:22, 84:10-85:20.

The foregoing deposition of Smith took place a year ago on December 17, 2019, nearly thirty years after the January 1990 trial of Gardner and twenty-six years after the Zain I ruling of the West Virginia Supreme Court of Appeals in In re: W. Va. State Police Crime Lab., 438 S.E.2d 501 (W. Va. 1993). In his report dated November 4, 1993, which was adopted by the Supreme Court and appended to Justice Miller's opinion, Judge Holliday related Smith's earlier testimony as follows:

> Smith, who became employed in the serology department after the departure of Moreland and Midkiff, testified that prior to his 1992 audit of Zain's work, he was unaware of any complaints regarding misconduct on the part of Zain. He testified that Zain, as his supervisor, never requested him to report results with which he disagreed. He further testified that he was never asked to report that tests had been performed when they had not been performed. Smith did testify, however, that after Zain left the department, problems began to surface with Zain's work.

Id. at 512 (internal citations omitted). The testimony attributed by Judge Holliday to Smith, received in 1993, when Smith's recollection would have been expected to be fresh, is consistent with his testimony twenty-six years later.

## II.   Summary Judgment Legal Standard

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Material" facts are those necessary to establish the elements of a party's cause of action.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010).  A "genuine" dispute of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-moving party.  Anderson, 477 U.S. at 248.

## III.   Summary Judgment Analysis

The remaining claims in this action arise under 42 U.S.C. § 1983.  Section 1983 generally provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  "Under 42 U.S.C. § 1983, a plaintiff must establish three elements to state a cause of action: (1) the deprivation of a right secured by the Constitution or a federal statute; (2) by a person; (3) acting under color of state law." Jenkins v. Medford, 119 F.3d 1156, 1159-60 (4th Cir. 1997) (citing 42 U.S.C. § 1983; West v. Atkins, 487 U.S. 42, 48 (1988)).

Gardner alleges that he was deprived of due process under Brady and Giglio.  In Brady, the Supreme Court of the United States held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87.  In United States v. Agurs, 427 U.S. 97 (1975), the Court found this principle to apply, inter alia, to cases in which no request for exculpatory evidence is made by a defendant.  Id. at 106-07; see also, e.g., Kyles v. Whitley, 514 U.S. 419, 433 (1995).

Giglio concerned two distinct, yet related, issues: (1) the government's failure to furnish material evidence concerning the credibility of a witness, i.e. impeachment evidence; and (2) the conviction of the defendant based upon false testimony from that witness.  405 U.S. at 151-55.  The

<u>Giglio</u> Court found that "impeachment evidence, [] as well as exculpatory evidence, falls within the <u>Brady</u> rule" for disclosure.  <u>United States v. Bagley</u>, 473 U.S. 667, 676 (1985) (citing <u>Giglio</u>, 405 U.S. at 154).  It also reiterated the rule of <u>Napue v. Illinois</u>, 360 U.S. 264 (1959), that "[a] new trial is required if '[] false testimony [offered by the government] could . . . in any reasonable likelihood have affected the judgment of the jury . . . .'" <u>Giglio</u>, 405 U.S. at 154 (quoting <u>Napue</u>, 360 U.S. at 271) (fourth and fifth alteration in original).

Gardner alleges that he was convicted based upon Zain's false testimony, resulting in a due process violation under <u>Giglio</u>.[3]  ECF No. 1, at ¶¶ 49-50, 100.  He also contends that the Prosecuting Attorney failed to disclose impeachment evidence concerning Zain's qualifications and credibility, a <u>Brady</u>-based due process argument.[4]  <u>Id.</u> at ¶ 102.

---

[3]    The testimony alleged to be false concerns Zain's statements that he had insufficient information from the Galati sample to conclude that Gardner could be excluded as a suspect.  ECF No. 1, at ¶¶ 49-50.  Thus, Gardner challenges the testimony <u>Ballard</u> found to be false.

[4]    This is also a <u>Giglio</u> argument insofar as <u>Giglio</u> is part of <u>Brady's</u> progeny concerning the disclosure of material impeachment evidence.

The defendants offer several arguments as to why the remaining claims should be dismissed on summary judgment. They generally assert that Gardner lacks evidence to support § 1983 <u>Monell</u> claims based on a policy or custom of constitutional violations by the Prosecuting Attorney and County Commission. ECF No. 101, at 2-6, 8-9, 13-17; ECF No. 105, at 7-12. This reference, of course, is to <u>Monell v. Dept. of Soc. Servs.</u>, 436 U.S. 658 (1978). They also contend that no underlying <u>Brady</u> and <u>Giglio</u> violations occurred during Gardner's trial inasmuch, they say, as Kanawha County prosecutors adhered to <u>Brady</u> and <u>Giglio</u> and were unaware of any issues with Zain's credibility or qualifications. ECF No. 101, at 7-10; ECF No. 105, at 6-7. They additionally argue that even if <u>Brady</u> and <u>Giglio</u> were violated, the violations were not material to Gardner's underlying conviction inasmuch as sufficient evidence apart from Zain's testimony existed to obtain a conviction, including fingerprint evidence. ECF No. 101, at 10-13.

With regard to <u>Monell</u>, the defendants contend that Gardner has no evidence of a policy or custom by the Prosecuting Attorney or County Commission to violate <u>Brady</u> and <u>Giglio</u>. Specifically, they state that the plaintiff cannot rebut the affidavits of Forbes, Whitmyer, Frail, and Morris, which demonstrate compliance by Kanawha County prosecutors with <u>Brady</u>

18

and <u>Giglio</u> generally and in Gardner's trial.  ECF No. 105, at 7-
8.  Additionally, they argue that the County Commission played
no role in the formulation of prosecutorial policy and, pursuant
to Forbes' affidavit, had no discretion over the "selection of,
retention of, evaluation of, or strategy pertaining to witnesses
in any criminal prosecution conducted by the Office of the
Kanawha County Prosecuting Attorney."  ECF No. 101, at 17.

        Gardner cites the December 17, 2019 deposition
testimony of Ted Smith in response.  He claims that Smith's
conversations with Kanawha County prosecutors regarding "the
[serology] lab's inability to find the data to support Zain's
conclusions and existing lab personnel's unwillingness to
testify to Zain reports unless rewritten" demonstrates, at
least, "a triable fact issue on the nature and extent of Smith's
discussions with KCPA prosecutors regarding Zain's work product
before Plaintiff's criminal trial" in 1990. ECF No. 104, at 11.
Gardner further offers the 1985 correspondence between the FBI
and Blake for the proposition that the "[d]efendants knew or
should have known of Zain's lack of qualifications as early as
1985 pursuant to the State of West Virginia's own internal
investigation . . . ."  <u>Id.</u> at 4.  With regard to the arguments
concerning the County Commission's role in the use of Zain as a
witness or the nondisclosure of facts concerning Zain's

19

credibility and qualifications, Gardner asserts that the court has already rejected this argument and that the Prosecuting Attorney's failure to adhere to Brady and Giglio is attributable to the County Commission inasmuch as the County Commission is "the entity it represents." Id. at 15-16.

The Supreme Court of the United States concluded in Monell that municipal entities, such as the two remaining defendants, are "included among those persons to whom § 1983 applies." Id. at 690. However, the Court determined that "a municipality cannot be held liable solely because it employs a tortfeasor — or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." Id. at 691. Thus, under Monell, "civil rights plaintiffs suing a municipal entity under 42 U.S.C. § 1983 must show that their injury was caused by a municipal policy or custom." Los Angeles Cnty. v. Humphries, 562 U.S. 29, 30 (2010); see also City of Canton v. Harris, 489 U.S. 378, 385 (1989) (requiring "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation").

"While municipal 'policy' is found most obviously in municipal ordinances, regulations and the like which directly command or authorize constitutional violations, . . . it may also be found in formal or informal ad hoc 'policy' choices or

decisions of municipal officials authorized to make and implement municipal policy." Spell v. McDaniel, 824 F.2d 1380, 1385-86 (4th Cir. 1987) (citing Pembaur v. City of Cincinnati, 475 U.S. 469 (1986) (single "policy" decision by county prosecutor)) (internal citation omitted).  Such single choices or decisions of policymakers may result in municipal liability, but "only where . . . a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." Pembaur, 475 U.S. at 483-84 (citing Oklahoma City v. Tuttle, 471 U.S. 808, 823 (1985) (plurality opinion)).

        The deliberate conduct required of a municipal policy must be the "moving force" behind a plaintiff's alleged injuries. Riddick v. School Bd. Of City of Portsmouth, 238 F.3d 518, 524 (4th Cir. 2000) (citing Bd. of the Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 404 (1997)).  Thus, "to impose section 1983 liability on a municipality" under a policy theory of liability, "a claimant must . . . show that 'a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision.'" Id. (quoting Bryan Cnty., 520 U.S. at 404); see also Carter v. Morris, 164 F.3d 215, 218 (4th

Cir. 1999); <u>Moody v. City of Newport News</u>, 93 F. Supp. 3d 516, 534 (E.D. Va. 2015).  "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.'"  <u>Bryan Cnty</u>, 520 U.S. at 404.

On the other hand, "custom" or "custom or usage" liability can arise when public employees "fall into patterns of unconstitutional conduct" without direct authorization by municipal policymakers.  <u>Spell</u>, 824 F.2d at 1390.  "This may result from a variety of factors not sufficiently traceable <u>in origin</u> to any fault of municipal policymakers to warrant treating the conduct as a reflection of 'municipal policy' in the <u>Monell</u> sense."  <u>Id.</u> (emphasis in original).  However, "[m]unicipal fault for allowing such a developed 'custom or usage' to continue requires (1) actual or constructive knowledge of its existence by responsible policymakers, and (2) their failure, as a matter of specific intent or deliberate indifference, thereafter to correct or stop the practices."  <u>Id.</u> at 1391.  "Actual knowledge may be evidenced by recorded reports to or discussions by a municipal governing body.  Constructive knowledge may be evidenced by the fact that the practices have been so widespread or flagrant that in the proper exercise of its official responsibilities the governing body should have

known of them." Id. at 1387.  "Both knowledge and indifference
can be inferred from the 'extent' of employees' misconduct."
Owens v. Baltimore City State's Att'ys Office, 767 F.3d 379,
402-03 (4th Cir. 2014) (quoting Spell, 824 F.2d at 1391).  That
said, "[p]revailing under such a theory is no easy task."  Id.
at 402.

        As to policy, the court agrees with the defendants
that Gardner has failed to offer evidence sufficient to present
a triable issue of fact regarding Monell liability based on a
policy of sanctioning Brady and Giglio violations.  For one, the
affidavits of Forbes, Whitmyer, Frail, and Morris establish that
the Prosecuting Attorney maintained a policy of disclosing
impeachment evidence at the time of trial.  Moreover, the
evidence indicates that Forbes was unaware of the problems now
associated with the use of Zain as a witness at the time of
Gardner's trial.  Forbes has stated in his affidavit that he was
not aware of problems with Zain's qualifications, credentials,
or credibility prior to or during Gardner's trial.  Indeed,
Forbes' integral role in bringing Zain's injustices to light in
1992 and 1993 tends to support this statement.

        The evidence offered by Gardner does not refute this
point.  As the defendants point out, ECF No. 105, at 3-5, Smith
could not provide a time frame that pinpoints the dates of

conversations between the serology lab and Kanawha County prosecutors regarding the quality of Zain's work and the need to rewrite his opinions.  But Smith did state that he did not personally begin to believe that Zain was "pro-prosecution" and "went beyond scientific soundness in order to strengthen his interpretation of the results" until after a 1992 audit of Zain's work.  ECF No. 103-3, at 72:17-72:22, 84:10-85:20.  The fact that the pro-prosecution belief did not arise until after the 1992 audit suggests that the relevant conversations with Kanawha County prosecutors, including Forbes, occurred in 1992, but, at the very least, this testimony does not suggest that any of these conversations occurred prior to or during Gardner's trial.

Further, the evidence offered by Gardner does not indicate that Forbes was aware of Zain's poor qualifications or training during the relevant period.  Smith himself stated that he could not determine whether he had knowledge of poor qualifications or training by 1990 but that he had learned of these issues by "sometime in 1991."  Further, Gardner has offered nothing to suggest that the Prosecuting Attorney knew of Blake's 1985 correspondence respecting Zain's low serology course performance with the FBI.

In sum, there is no evidence that Forbes or his Assistant Prosecuting Attorneys were aware of any qualification or veracity problems surrounding the use of Zain as a witness at the time of Gardner's trial.  Rather, the defendants have offered affidavits to the contrary.  Thus, it cannot be said that any conscious decision by the Prosecuting Attorney to use Zain as a witness, generally or in Gardner's case, constituted "deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision."  Riddick, 238 F.3d at 524 (quoting Bryan Cnty., 520 U.S. at 404).  Gardner accordingly cannot succeed on a policy theory of liability against the Prosecuting Attorney.

Gardner's custom-based theory of Monell liability similarly fails.  As noted, an actionable custom requires a policymaker's actual or constructive knowledge of patterns of unconstitutional conduct by subordinates and failure, through specific intent or deliberate indifference, to stop the unconstitutional practices.  The potentially relevant pattern of conduct in this case would be Assistant Prosecuting Attorneys' repeated use of Zain's testimony, though aware that it may be false.  It would also include their repeated knowing of the failure to disclose impeachment evidence relating to the serologist's qualifications and credibility.  But just as there

is no evidence demonstrating the Prosecuting Attorney's awareness of problems associated with the use of Zain's testimony, there is no evidence of the Prosecuting Attorney's actual or constructive knowledge that Assistant Prosecuting Attorneys violated the constitutional rights of defendants by obtaining convictions based upon false testimony by Zain or failing to make the relevant Brady/Giglio disclosures.  Further, Gardner has offered no evidence that the Prosecuting Attorney specifically intended to allow such violations to happen or was deliberately indifferent to them.

Therefore, the court concludes that the defendants correctly argue that Gardner has failed to offer evidence of a Monell policy or custom such that a reasonable fact-finder could assess municipal liability and return a verdict for Gardner. Summary judgment will accordingly be entered in favor of the Prosecuting Attorney.

Insofar as the claims asserted against the County Commission hinge on the conduct of the Prosecuting Attorney, summary judgment will also be entered in favor of the County Commission.  To the extent that they do not, however, the court agrees with the defendants that there is no evidence in the record that supports any Monell claim against the County Commission.  Forbes' affidavit states that "the County

Commission was not involved, directly or indirectly in any activity of criminal prosecution . . . conducted by the Office of the Kanawha County Prosecuting Attorney." ECF No. 100-1, at 5. The affidavit continues: "the Kanawha County Commission was not involved in any case handling decisions such as the production of evidence, motion practice, or the evaluation of evidence in any criminal prosecution conducted by the Office of the Kanawha County Prosecuting Attorney." Id. Forbes additionally avers that the County Commission "was not involved in the selection of, retention of, evaluation of, or strategy pertaining to witnesses in any criminal prosecution . . . ." Id. Forbes states that during his tenure as the county's prosecuting attorney, the County Commission's only involvement in the affairs of his office concerned funding and other budgetary matters. Id.

Gardner offers no evidence to controvert any of these points. Accordingly, the court finds no evidence of a policy or custom of Brady and Giglio violations attributable to the County Commission, and summary judgment in favor of this defendant is appropriate irrespective of the court's findings regarding the Prosecuting Attorney.

Finally, the court notes that Gardner has undertaken to establish that any non-disclosure of impeachment evidence and any use of false testimony would have been material to his conviction and constituted due process violations.  ECF No. 104, at 9-14.  But such issues are distinct from the assessment of civil municipal liability and involve significantly different standards from those relevant to a Monell analysis.  See, e.g., Kyles, 514 U.S. at 434-38; Giglio, 405 U.S. at 153-54; United States v. Kelly, 35 F.3d 929, 933 (4th Cir. 1994); Ballard, 172 F. Supp. 3d at 935-36.  And inasmuch as it is clear that the plaintiff has not offered evidence necessary for his claims to survive summary judgment under Monell and that there is no genuine issue as to any material fact, the court does not reach these issues.

## IV.  Conclusion

Accordingly, it is ORDERED that the defendants' motion for summary judgment be (ECF No. 100), and it hereby is, GRANTED.  All remaining claims asserted against defendants Kanawha County Commission and Kanawha County Prosecuting Attorney are dismissed.

The Clerk is directed to transmit copies of this memorandum opinion and order to all counsel of record and any unrepresented parties.

ENTER:  December 10, 2020

John T. Copenhaver, Jr.
Senior United States District Judge